David B. Shemano (State Bar No. 176020)
dshemano@shemanolaw.com
SHEMANOLAW
1801 Century Park East, Suite 2500
Los Angeles, CA 90067
Telephone: (310) 492-5033

Bankruptcy Counsel for the Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>JASON MOWATT,<br><br>Debtor and Debtor in Possession. | Case No. 2:26-bk-10379-NB<br><br>Chapter 11<br><br>**FIRST AMENDED PLAN OF REORGANIZATION OF JASON MOWATT DATED OCTOBER 16, 2026** |

SHEMANOLAW
LOS ANGELES

**PLEASE TAKE NOTICE** that attached as Exhibit A is copy of the *First Amended Plan Of Reorganization Of Jason Mowatt Dated October 16, 2026*, filed by the above-captioned debtor and debtor in possession, on October 16, 2026 (the "Plan"). This is not a solicitation of acceptance or rejection of the Plan. Acceptances or rejections may not be solicited until the Bankruptcy Court authorizes the solicitation of votes on the Plan.

DATED: October 16, 2026

**SHEMANOLAW**

By: /s/ David B. Shemano
David B. Shemano

Bankruptcy Counsel for the Debtor and Debtor in Possession

SHEMANOLAW
LOS ANGELES

# EXHIBIT A

# FIRST AMENDED PLAN OF REORGANIZATION OF JASON MOWATT

DATED October 16, 2026

# Table of Contents


I. INTRODUCTION ..... 1

A. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing ..... 1

B. Identity of Person to Contact for More Information Regarding the Plan ..... 1

C. Disclaimer ..... 1

II. BACKGROUND ..... 2

A. Description and History of the Debtor's Businesses ..... 2

B. The Debtor's Assets ..... 3

C. The Debtor's Liabilities ..... 3

1. Secured Claims ..... 3

2. Priority Tax Claim ..... 3

3. General Unsecured Creditors ..... 3

III. TREATMENT OF UNCLASSIFIED CLAIMS ..... 3

A. Statutory Fees ..... 4

B. Administrative Claims ..... 4

C. Priority Tax Claims ..... 5

IV. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..... 6

1. Class 1 – Non-Tax Priority Claims ..... 6

2. Class 2 -- Secured Claims ..... 7

3. Class 3 -- General Unsecured Claims ..... 8

4. Class 4 – Insured Claims ..... 8

5. Class 5 – Subordinated Claims ..... 9

6. Reservation of Reorganized Debtor's Rights Regarding Claims ..... 9

V. ACCEPTANCE OF THIS PLAN ..... 10

A. Classes Entitled to Vote. ..... 10

B. Acceptance by Impaired Classes. ..... 10

C. Elimination of Classes. ..... 10

D. Cramdown. ..... 10

VI. MEANS FOR IMPLEMENTATION OF THIS PLAN ..... 10

A. Revesting of Assets. ..... 10

B. Sources of Cash for Distribution. ..... 11

C. Effectuating Documents; Further Transactions. 11
D. Exemption From Certain Transfer Taxes and Recording Fees. 11
E. Further Authorization. 11
VII. PROVISIONS GOVERNING DISTRIBUTIONS 11
A. Allowed Claims and Interests 11
B. Distributions for Claims Allowed as of the Effective Date 12
C. Undeliverable Distributions 13
D. Interest and Penalties on Claims 13
E. Means of Cash Payment 13
F. Withholding and Reporting Requirements 13
G. Setoffs 14
H. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims 14
1. Authority and Deadline 14
2. Creation of Reserves for Disputed Claim 14
3. Estimation of Claims. 14
4. Distributions Relating to Disputed Claims 15
5. Disallowed Claims 15
VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES 15
A. Assumption/Rejection 15
IX. PROJECTED DISPOSABLE INCOME 17
X. LIQUIDATION ANALYSIS AND FEASIBILITY 17
A. Liquidation Analysis 17
B. Feasibility 18
XI. CONFIRMATION AND CONSUMMATION OF THIS PLAN 19
A. Condition To Entry of the Confirmation Order. 19
B. Conditions To Effective Date. 19
C. Waiver Of Condition. 20
XII. EFFECT OF PLAN CONFIRMATION 20
A. Binding Effect. 20
B. Revesting of Assets. 20

C. Discharge of the Debtor. ........ 20
D. Exculpation and Limitation of Liability. ........ 21
E. Plan Default ........ 22
F. Term of Bankruptcy Injunction or Stays. ........ 22
G. Post-Effective Date Retention of Professionals. ........ 22
XIII. RETENTION OF JURISDICTION ........ 22
A. Retention of Jurisdiction ........ 22
B. Failure of Bankruptcy Court to Exercise Jurisdiction ........ 24
XIV. MISCELLANEOUS PROVISIONS ........ 24
A. Payment Of Statutory Fees. ........ 24
B. Post-Confirmation Status Report. ........ 25
C. Amendment Or Modification Of This Plan. ........ 25
D. Severability of Plan Provisions. ........ 25
E. Successors and Assigns. ........ 25
F. Revocation, Withdrawal, or Non-Consummation. ........ 26
G. Notice. ........ 26
H. Governing Law. ........ 26
I. Tax Reporting and Compliance. ........ 27

# I.

# INTRODUCTION

Jason Mowatt is the chapter 11 debtor in this case (the "***Debtor***"). The Debtor commenced this voluntary case by filing a chapter 11 petition under the United States Bankruptcy Code, 11 U.S.C. § 101 *et. seq* (the "***Bankruptcy Code***"), on January 15, 2026 (the "***Petition Date***").

The Debtor proposes the following plan of reorganization for the resolution of the outstanding Claims against and Interests in the Debtor (the "***Plan***"). Any capitalized term that is not otherwise defined herein shall have the meanings set forth in **Exhibit A**. Subject to certain restrictions and requirements set forth in section 1193 of title 11 of the United States Code and Rule 3019 of the Federal Rules of Bankruptcy Procedure, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan.

This is a reorganizing plan. In other words, the Plan provides for the revesting of substantially all of the Debtor's assets in the Reorganized Debtor and payments to Creditors on account of their Allowed Claims. The Effective Date of the proposed Plan is expected to be on or before December 31, 2026.

## A. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

After the Bankruptcy Court sets a hearing date to consider confirmation of the Plan, you will receive notice of the hearing date, the deadline to file an objection to the Plan, and the deadline to submit a ballot to accept or reject the Plan.

## B. Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact counsel for the Debtor, ShemanoLaw, attention: David B. Shemano, Esq., 1801 Century Park East, Suite 2500, Los Angeles, CA 90067,(310) 492-5033, dshemano@shemanolaw.com.

## C. Disclaimer

The financial data relied upon in formulating the Plan is based on the Debtor's books and

records and documents filed with the Bankruptcy Court. The Debtor represents that everything stated in the Plan is true to the Debtor's best knowledge. The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

# II.

# BACKGROUND

## A. Description and History of the Debtor's Businesses

The Debtor is the founder and primary operator of Trap Karaoke, LLC, a promoter that organizes interactive events where participants sing along and dance to hip-hop songs. Formed in 2015, Trap Karaoke organizes approximately 70 events each year in clubs and concert venues across the country. At each event approximately 15-20 attendees are selected to appear on stage and sing a chosen trap, R&B, Old School, or Gospel song. In 2025, Trap Karaoke generated over $5.9 million in revenue from ticket sales and sponsorships.

In July 2019, the Debtor was sued in the District Court for the Southern District of New York by Dela Yador, a former colleague of the Debtor who alleged he was a co-founder of Trap Karaoke, that Trap Karaoke operated as a general partnership with the Debtor and Mr. Yador as the general partners, that the Debtor breached the partnership agreement, and Mr. Yador was entitled to various remedies. The Debtor denied the allegations. Trap Karaoke is not a party to the litigation.

On March 11, 2025, a jury verdict was issued in favor of Mr. Yador against the Debtor that (1) a partnership existed until it was terminated on September 18, 2017, (2) the value of Mr. Yador's share of the partnership assets at the time of termination was $1,824,328, and (3) Mr. Yador's share of the net profits until termination was $157,500. On September 16, 2025, the District Court entered its order affirming the jury verdict. While the Debtor filed a notice of appeal, Mr. Yador promptly commenced judgment enforcement proceedings against the Debtor.

Litigating the Yador litigation was very expensive and time-consuming for the Debtor. Because Trap Karaoke has been the Debtor's sole source of income the past several years, the litigation had two serious negative consequences for Trap Karaoke and the Debtor. First, because of the distractions caused by the litigation, the Debtor's ability to focus on the business was limited, which depressed revenue. And second, because of the cost of the litigation, Trap Karaoke deferred the payment of over $1 million in sales tax owed to over two dozen state taxing authorities. The Debtor, as the principal of Trap Karaoke, has personal liability for the deferred sales tax.

Based on the facts and circumstances, the Debtor determined that a chapter 11 filing is necessary to address his current financial circumstances while also providing the Debtor with a fresh start.

**B. The Debtor's Assets**

The Debtor does not own any valuable real or personal property other than his membership interest in Trap Karaoke, LLC.

**C. The Debtor's Liabilities**

As of the Petition Date, there were approximately 28 creditors holding claims against the Debtor's estate as set forth below.

**1. Secured Claims**

The Debtor does not have any secured creditors.

**2. Priority Tax Claim**

The Debtor estimates that Trap Karaoke owes approximately $1,130,000 in state sales tax for the years 2017-2025 in 24 different jurisdictions. Under the applicable law of the states where the tax is owed, the Debtor has personal liability in his capacity as the operator of Trap Karaoke.

**3. General Unsecured Creditors**

In the Debtor's Schedules of Assets and Liabilities, the Debtor scheduled non-insider unsecured claims totaling approximately $2.57 million. The largest schedule unsecured creditor is Dela Yador, whose claim was scheduled for $1,981,828. Yador has filed a proof of claim for 3,584,318.82. As set forth below, the Plan treats the Yador as a subordinated claim pursuant to section 510(b) of the Bankruptcy Code.

## III.

## TREATMENT OF UNCLASSIFIED CLAIMS

Certain types of claims are not placed into voting classes; instead, they are unclassified. They are not considered Impaired, and they do not vote on the Plan because they are automatically entitled to specific treatment as provided in the Bankruptcy Code. As such, the following Claims are ***not*** placed in a Class.

### A. Statutory Fees

On the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930, including, without limitation, any U.S. Trustee Fees incurred pursuant to 28 U.S.C. § 1930(a)(6), as determined by the Bankruptcy Court at the Confirmation Hearing, to the extent not previously paid by the Debtor, shall be paid in Cash in full. The Reorganized Debtor shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) after the Effective Date. Following Confirmation, the Reorganized Debtor will file with the Bankruptcy Court and serve on the United States Trustee quarterly financial reports regarding all income and disbursements, including all Plan payments, for each quarter (or portion thereof) that the Chapter 11 Case remains open.

### B. Administrative Claims

Administrative expenses are Claims for costs or expenses of administering the Debtor's Chapter 11 Case that are Allowed Claims under Bankruptcy Code section 507(a)(2). On the latest of (a) the Effective Date, (b) the date on which an Administrative Claim becomes an Allowed Administrative Claim, or (c) the date on which an Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of such Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim. Notwithstanding the foregoing, (y) any Allowed Administrative Claim based on a liability incurred by the Debtor in the ordinary course of business during the Chapter 11 Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (z) any Allowed Administrative Claim may be paid on such other terms as may be agreed to between the Holder of such Claim and the Debtor or the Reorganized Debtor.

The following chart lists the Debtor's section 507(a)(2) Administrative Claims and their treatment under the Plan:

| Name | Amount Owed | Treatment |
|---|---|---|
| Clerk's Office Fees | Estimated amount owed as of Effective Date is $0 | Paid in full on the Effective Date to the extent Allowed |
| Office of the U.S. Trustee Fees | Estimated amount owed as of Effective Date is $0 | Paid in full on the Effective Date to the extent Allowed |
| ShemanoLaw<br>*Bankruptcy Counsel for the Debtor* | Estimated amount owed as of Effective Date is $75,000 | Paid in full on and after the Effective Date to the extent Allowed. ShemanoLaw is holding a |

| Name | Amount Owed | Treatment |
|---|---|---|
| | | $27,918.00 retainer that will be applied to the amount owed. |
| Mark Sharf<br>*Subchapter V Trustee* | Estimated amount owed as of Effective Date will be $17,324 | Paid in full on and after the Effective Date to the extent Allowed. |

Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Case prior to the Effective Date shall file with the Bankruptcy Court and serve on the Reorganized Debtor an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Case on or before the 60th day following the Effective Date. FAILURE TO FILE AND SERVE SUCH PROFESSIONAL FEE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE PROFESSIONAL FEE CLAIM BEING FOREVER BARRED AND DISCHARGED. Without limiting the foregoing, the Reorganized Debtor may pay the charges incurred by the Reorganized Debtor on and after the Effective Date for any professional's fees, disbursements, expenses or related support services, without application to or approval by the Bankruptcy Court.

As indicated above, the Debtor projects it will need to pay approximately $64,406 worth of Administrative Claims on the Effective Date of the Plan (or when the Claim becomes Allowed). As indicated elsewhere in this Plan, the Debtor will have sufficient Cash on hand on the Effective Date of the Plan to pay all Administrative Claims on the Effective Date or as otherwise provided above.

**C. Priority Tax Claims**

Priority Tax Claims are certain unsecured income, employment and other taxes described by Bankruptcy Code section 507(a)(8). On the later of (a) the Effective Date or (b) the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, in the sole discretion of, prior to the Effective Date, the Debtor or, after the Effective Date, the Reorganized Debtor, (i) Cash equal to the unpaid portion of such Holder's Allowed Priority Tax Claim, (ii) treatment in any other manner such that such Holder's Allowed Priority Tax Claim shall be paid in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code over a period not ending later than five years from the Petition Date, or (iii) such other treatment as to which the Debtor or the Reorganized Debtor and such Holder shall have agreed upon in writing.

As set forth in **Exhibit B** to this Plan, the Debtor estimates that the section 507(a)(8) Priority Tax Claims shall be approximately $1,130,000. The Priority Tax Claims will be paid in full over five years.

## IV.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtor. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

| *Class* | *Treatment* |
|---|---|
| Class 1 – Non-Tax Priority Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 2 – Secured Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 3 – General Unsecured Claims | Impaired – Entitled to vote |
| Class 4 – Insured Claims | Unimpaired – Deemed to have accepted this Plan and not entitled to vote |
| Class 5 – Subordinated Claims | Impaired – Entitled to vote |

### 1. Class 1 – Non-Tax Priority Claims

Except to the extent that the Holder of an Allowed Non-Tax Priority Claim has agreed to a less favorable treatment of such Claim, on the latest of (a) the Effective Date, (b) the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, (c) the date on

which such Allowed Non-Tax Priority Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between the Debtor and the Holder of such Non-Tax Priority Claim, each Holder of an Allowed Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim.

Class 1 is an Unimpaired Class, and the Holders of Non-Tax Priority Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Non-Tax Priority Claims are not entitled to vote to accept or reject the Plan.

**2. Class 2 -- Secured Claims**

Secured Claims are Claims secured by Liens on property of the estate. The Debtor is now aware of any Secured Claims.

On the Effective Date, each Holder of an Allowed Secured Claim shall, at the option of the Debtor, be entitled to the treatment set forth below in option A, B, C, or D. The Reorganized Debtor specifically reserve the right to challenge the validity, nature and perfection of, and to avoid pursuant to the provisions of the Bankruptcy Code and other applicable law, any purported Claims and Liens relating to a Secured Claim.

Option A: Allowed Secured Claims with respect to which the Debtor elects option A shall be Reinstated. The failure of the Debtor to file an objection, prior to the Effective Date, with respect to any Secured Claim that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtor to contest or otherwise defend against such Claim in an appropriate forum when and if such Claim is sought to be enforced. Any cure amount that the Debtor may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such Reinstated Secured Claim shall be paid on the latest of (a) the Effective Date, (b) the date on which such Secured Claim becomes Allowed, and (c) such other date as mutually may be agreed to by and between such Holder and the Debtor or Reorganized Debtor.

Option B: Allowed Secured Claims with respect to which the Debtor elects option B shall be paid in Cash, in full, including any amounts owed under section 506 of the Bankruptcy Code, on the latest of (a) the Effective Date, (b) the date on which such Secured Claim becomes an Allowed Secured Claim, (c) the date on which such Secured Claim is otherwise due and payable, and (d) such other date as mutually may be agreed to by and between such Holder and the Debtor or Reorganized Debtor.

Option C: Allowed Secured Claims with respect to which the Debtor elects option C shall be satisfied by the surrender to the Holder of the Claim of the collateral securing the applicable Secured Claim.

Option D: Allowed Secured Claims with respect to which the Debtor elects option D shall be satisfied in accordance with such other terms and conditions as may be agreed upon by the Debtor or Reorganized Debtor and the Holder of such Allowed Secured Claim.

The Debtor shall be deemed to have elected option A with respect to all Allowed Secured Claims except those with respect to which the Debtors elect another option in writing and filed not later than five (5) days prior to the Confirmation Hearing.

Class 2 is an Unimpaired Class, and the Holders of Secured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Secured Claims are not entitled to vote to accept or reject the Plan.

**3. Class 3 -- General Unsecured Claims**

A General Unsecured Claim means a Claim against the Debtor that is not an Administrative Claim, Insured Claim, Non-Tax Priority Claim, Priority Tax Claim, Secured Claim, or Subordinated Claim. The Debtor estimates that the aggregate Allowed Amount of General Unsecured Claims will be approximately $595,000.

Each Holder of a General Unsecured Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such General Unsecured Claims, Cash in the amount of the Holder's Pro Rata Share of the Disposable Income, if any, remaining after Priority Tax Claims have been paid in full.

Class 3 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, the Holders of General Unsecured Claims are entitled to vote to accept or reject this Plan.

**4. Class 4 – Insured Claims**

All Insured Claims against the Debtor are placed in Class 4. An Insured Claim is a Claim against a Debtor that is covered by insurance or an indemnity policy, agreement, bond or right maintained by or for the benefit of such Debtor, but only to the extent of coverage or liability under the insurance or indemnity policy, agreement, bond or right.

On the Effective Date, all Insured Claims shall be Reinstated by leaving unaltered the legal, equitable, and contractual rights to which the Insured Claim entitles the Holder of the Insured Claim.

Class 4 is an Unimpaired Class, and the Holders of Insured Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Insured Claims are not entitled to vote to accept or reject the Plan.

**5. Class 5 – Subordinated Claims**

All Subordinated Claims against the Debtor are placed in Class 5. A Subordinated Claim is a Claim subject to subordination under section 510(b) or (c) of the Bankruptcy Code. The Claim of Dela Yador is a Subordinated Claim because it is based on an equity interest in an affiliate of the Debtor.

The Holder of an Allowed Subordinated Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Subordinated Claim, Cash in the amount of the Holder's Pro Rata Share of the Disposable Income, if any, remaining after Priority Tax Claims and General Unsecured Claims have been paid in full.

Class 5 is Impaired. Pursuant to section 1126 of the Bankruptcy Code, the Holders of Subordinated Claims are entitled to vote to accept or reject the Plan.

**6. Reservation of Reorganized Debtor's Rights Regarding Claims**

In accordance with section 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtor will retain and may (but is not required to) enforce all Retained Actions. After the Effective Date, the Reorganized Debtor, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court. The failure to specifically list any claim, right of action, suit, proceeding, or other Retained Action in the Plan does not, and will not be deemed to, constitute a waiver or release by the Debtor or the Reorganized Debtor of such claim, right of action, suit, proceeding or other Retained Action, and the Reorganized Debtor will retain the right to pursue such claims, rights of action, suits, proceedings, and other Retained Actions in its sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches will apply to such claim, right of action, suit, proceeding, or other Retained Action upon or after the confirmation or consummation of the Plan.

Except as otherwise provided in the Plan, all of the Debtor's rights, title and interest in any litigation Claims or actions, including, but not limited to, claims or actions under Bankruptcy Code sections 544, 547, 548, and 549, (a) alleged, (b) pending, or (c) that may be alleged in a future complaint (the "***Avoidance Actions***") are preserved by the Plan. On the Effective Date of the Plan, the Reorganized Debtor shall be authorized to investigate all Avoidance Actions and to initiate and/or prosecute any and all such Avoidance Actions that the Reorganized Debtor, in its sole discretion, determine should be prosecuted.

Except as otherwise expressly provided in the Plan, nothing shall affect the Debtor or the Reorganized Debtor's rights and defenses, both legal and equitable, including all legal and equitable defenses to setoffs against or recoupments, with respect to any Claims, including with

respect to Claims in Unimpaired Classes.

# V.

# ACCEPTANCE OF THIS PLAN

**A. Classes Entitled to Vote.**

Classes 3 and 5 are Impaired and entitled to vote to accept or reject this Plan. By operation of law, Classes 1, 2, and 4 are Unimpaired Classes and deemed to have accepted this Plan and, therefore, are not entitled to vote.

**B. Acceptance by Impaired Classes.**

An Impaired Class of Claims shall have accepted this Plan if, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code, (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept this Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept this Plan.

**C. Elimination of Classes.**

To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from this Plan for purposes of (a) voting to accept or reject this Plan and (b) determining whether it has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

**D. Cramdown.**

To the extent necessary, the Debtor may request confirmation of this Plan, as it may be modified from time to time, under section 1191(b) of the Bankruptcy Code. The Debtor reserves the right to modify this Plan to the extent, if any, that confirmation pursuant to section 1129(a) or 1191(b) of the Bankruptcy Code requires modification.

# VI.

# MEANS FOR IMPLEMENTATION OF THIS PLAN

**A. Revesting of Assets.**

Except as otherwise explicitly provided in this Plan, on the Effective Date, all property comprising the Estate (including Retained Actions) shall vest in the Reorganized Debtor.

**B. Sources of Cash for Distribution.**

All Cash necessary for the Reorganized Debtor to make payments required by this Plan shall be obtained from the income received by the Reorganized Debtor from his services to and ownership of Trap Karaoke, LLC. Attached as **Exhibit C** is a five year budget showing the projected income that Trap Karaoke will be able to distribute to the Reorganized Debtor. To the extent income received from Trap Karaoke is insufficient, the Reorganized Debtor has exempt assets of approximately $110,000 that will be available to make required payments.

**C. Effectuating Documents; Further Transactions.**

The Debtor and Reorganized Debtor are authorized to execute, deliver, file, or record all contracts, instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, or to otherwise comply with applicable law.

**D. Exemption From Certain Transfer Taxes and Recording Fees.**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to the Reorganized Debtor or to any other Entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtor's or the Estate's real or personal property, will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**E. Further Authorization.**

The Reorganized Debtor shall be entitled to seek such orders, judgments, injunctions, and rulings as it deems necessary to enforce, carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

## VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

**A. Allowed Claims and Interests**

The Reorganized Debtor shall have the responsibility for making the post-Effective Date payments and distributions to creditors required by the Plan. Notwithstanding any provision

herein to the contrary, with respect to distributions on account of pre-Effective Date Claims, the Reorganized Debtor shall make distributions only to Holders of Allowed Claims. A Holder of a Disputed Claim shall receive only a distribution on account thereof when and to the extent that such Holder's Disputed Claim becomes an Allowed Claim.

**B. Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date. Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Distributions to Holders of Allowed Claims will be made by mail as follows:

(a) If the Holder filed a proof of claim, distributions will be sent to the address, if any, set forth on the proof of claim;

(b) If the Holder, after filing a proof of claim, delivered or delivers to the Debtor's attorneys a written notice of address change, distributions will be sent to the address set forth in the written notice and not the address set forth on the proof of claim;

(c) If no proof of claim was filed or if the filed proof of claim does not set forth a legible and complete address and if the Debtor's attorneys have not received a written notice of address change, distributions will be sent to the address set forth in the Debtor's schedules of assets and liabilities (the "***Schedules***"); or

(d) If no proof of claim was filed or if the proof of claim does not set forth a legible, complete address, the Debtor's attorneys have not received a written notice of address change; and the Schedules do not set forth a complete address, then the distribution will be deemed to be an "Undeliverable Distribution" as defined below.

### C. Undeliverable Distributions

If a distribution is made and returned to the Reorganized Debtor marked as undeliverable or undelivered for any reason, the distribution shall be deemed an "***Undeliverable Distribution***." If a distribution to a Holder is returned to the Reorganized Debtor as an Undeliverable Distribution or is deemed to be an Undeliverable Distribution, the Reorganized Debtor shall make no further distribution to the Holder unless and until the Reorganized Debtor is timely notified by such Holder, in writing, of the Holder's current address. Any Holder who is otherwise entitled to an Undeliverable Distribution and who does not, within 60 days after the attempted delivery thereof (the "***60-Day Period***"), provide the Reorganized Debtor with written notice asserting its claim in that Undeliverable Distribution and setting forth a current, deliverable address, will be deemed to waive any claim to or interest in that Undeliverable Distribution and will be forever barred from receiving that Undeliverable Distribution from the Reorganized Debtor. Any Undeliverable Distributions that are not claimed prior to the expiration of the 60-Day Period shall revert back to the Reorganized Debtor free and clear of all claims of the Holder and all other Holders of Allowed Claims. The Reorganized Debtor shall not have any obligation to attempt to locate any Holder whose distribution is undeliverable.

### D. Interest and Penalties on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, required by applicable bankruptcy law, or necessary to render a Claim Unimpaired, postpetition interest and penalties shall not accrue or be paid on any Claims, including Priority Tax Claims and Non-Tax Priority Claims, and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim becomes an Allowed Claim and is satisfied in accordance with the terms of the Plan.

### E. Means of Cash Payment

Payments of Cash made pursuant to the Plan shall be made, at the option and in the sole discretion of the Reorganized Debtor, by checks drawn on, or wire transfer from, a domestic bank selected by the Reorganized Debtor. Cash payments to foreign creditors may be made, at the option of the Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### F. Withholding and Reporting Requirements

In connection with the Plan and all distributions hereunder, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting

requirements, including in requiring the Holder of any Allowed Claim to provide the Reorganized Debtor with any information, completed and signed state or federal tax forms, or other documents as the Reorganized Debtor may reasonably request.

**G. Setoffs**

The Reorganized Debtor may, pursuant to applicable law, but shall not be required to, set off against any Claim the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims or rights of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Holder of such Claim*; provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such claim or rights that the Debtor or the Reorganized Debtor may have against such Holder. The Debtor or the Reorganized Debtor shall provide notice of any proposed setoff to the Holder of such Claim at least five (5) days prior to effectuating such setoff.

**H. Procedures for Resolving Disputed, Contingent, and Unliquidated Claims**

**1. Authority and Deadline**

The Reorganized Debtor shall have the sole right to file objections to all Disputed Claims; *provided, however,* if any party in interest requests that the Reorganized Debtor object to a certain Claim, and if the Reorganized Debtor refuses to file the objection, and the requesting party can demonstrate to the Bankruptcy Court that a good faith basis for the objection exists, the Bankruptcy Court may enter an order authorizing the requesting party to file an objection to the Claim. Any objections to Disputed Claims shall be served and filed in the Bankruptcy Court on or before one hundred twenty (120) days after the Effective Date.

**2. Creation of Reserves for Disputed Claim**

The Reorganized Debtor shall (i) establish and maintain a reserve for Disputed Claims, (ii) establish and maintain a reserve for unclaimed distributions, and (iii) establish any other reserves or accounts it deems necessary or appropriate. All Cash held in the reserves shall be invested only in investments permitted under the Bankruptcy Code and maintained in accounts held at authorized bank depositories.

**3. Estimation of Claims.**

The Reorganized Debtor may at any time request that the Bankruptcy Court estimate any contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the

Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection and make distributions under the Plan with respect to other Allowed Claims in the same Class after making an appropriate reserve based on the estimated amount of such Disputed or contingent Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Except as provided herein, Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

#### 4. Distributions Relating to Disputed Claims

At such time as a Disputed Claim becomes an Allowed Claim, the Reorganized Debtor shall distribute to the Holder of such Claim such Cash as the Holder is entitled to under the Plan, which distribution shall occur as soon as practicable after the date that the order or judgment allowing any Disputed Claim becomes a Final Order. To the extent that a portion of a Disputed Claim is not disputed, the undisputed portion shall be deemed an Allowed Claim and the Holder shall receive a distribution on account of the Allowed Claim as otherwise set forth in the Plan.

#### 5. Disallowed Claims

All Disputed Claims held by Entities against whom or which a Debtor or the Reorganized Debtor have commenced, or described in the Plan as possible, a proceeding asserting a claim for relief under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code and shall continue to be Disallowed for all purposes until the Avoidance Action against such party has been settled or resolved by Final Order and any sums due to the Debtor or the Reorganized Debtor from such party have been paid.

## VIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Assumption/Rejection

The Debtor is unaware of any Executory Contract or Unexpired Lease to which the Debtor is a party. To the extent the Debtor is a party to an Executory Contract or Unexpired Lease, such Executory Contract and Unexpired Lease shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such Executory Contract or Unexpired Lease:

(a) has been previously rejected by the Debtor by Final Order of the Bankruptcy Court;

(b) has been rejected by the Debtor by order of the Bankruptcy Court in effect as of the Confirmation Date (which order may be the Confirmation Order);

(c) is the subject of a motion to reject filed by the Debtor under section 365 of the Bankruptcy Code pending as of the Confirmation Date; or

(d) is otherwise identified in the Plan as a contract that is not assumed under the Plan.

An Executory Contract or Unexpired Lease that is assumed prior to entry of the Confirmation Order shall be referred to as an "***Assumed Contract***." An Executory Contract that is rejected or subject to a motion to reject prior to entry of the Confirmation Order shall be referred to as a "***Rejected Contract***."

With respect to any Assumed Contract or Rejected Contract (as applicable), unless otherwise provided by an order of the Bankruptcy Court, entry of the Confirmation Order by the Bankruptcy Court shall constitute findings by the Bankruptcy Court that (i) the Debtor and the Reorganized Debtor has properly provided for the cure of any defaults that might have existed consistent with the requirements of section 365(b)(1) of the Bankruptcy Code, (ii) each assumption (or rejection, as the case may be) is in the best interest of the Debtor and the Estate and that each Assumed Contract is assumed and each Rejected Contract is rejected as of the Effective Date, and (iii) the requirements for assumption (or rejection, as the case may be) of any Executory Contract or Unexpired Lease to be assumed or rejected have been satisfied. No provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtor based on the filing of the petition initiating the Chapter 11 Case or the financial condition of the Debtor shall be enforceable. At the election of the Debtor, all cure payments under any Assumed Contract will be made by the Reorganized Debtor (1) on the Effective Date, (2) in eight equal quarterly payments plus interest at the Prime Adjusted Rate paid quarterly, or (3) upon such other terms as may be agreed to by the Debtor and the non-Debtor party to the Assumed Contract. In the event of a dispute, cure payments required by section 365(b)(1) of the Bankruptcy Code shall be paid consistent with the preceding sentence commencing upon entry of a Final Order resolving such dispute; *provided, however*, if an objection to the Debtor's proposed cure amount is sustained by the Bankruptcy Court, the Reorganized Debtor, in its sole discretion, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

Unless otherwise provided by an order of the Bankruptcy Court, any Claim arising from the rejection of an Executory Contract or Unexpired Lease must be filed by the Holder of such Claim with the Bankruptcy Court and served on the parties entitled to notice under the Plan no

later than sixty (60) days after the later of (1) the Effective Date or (2) the effective date of such rejection, subject to the Debtor's and the Reorganized Debtor's right to object thereto. In the event of such objection, the Debtor shall not be obligated to make any distribution in respect of such Claim until such dispute is resolved by Final Order of the Bankruptcy Court or the agreement of the parties.

## IX.

## PROJECTED DISPOSABLE INCOME

Section 1191(c)(2)(A) of the Bankruptcy Code requires that the Plan provide that all of the "projected disposable income" of the Debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the Bankruptcy Court may fix, beginning on the date that the first payment is due under the Plan will be applied to make payments under the plan. Section 1191(d) defines "disposable income" as the income received by the debtor that is not reasonable necessary to be expended for (a) the maintenance or support of the debtor or a dependent of the debtor, or (b) a domestic support obligation that first becomes payable after the date of the filing of the petition.

Included in **Exhibit C** is a five year budget that details the Debtor's (a) projected income and (b) reasonable expenses over the five year period. The budget projects that the total income exceeding the total expenses will be $1,167,833. Accordingly, the Debtor will be paying $1,167,833 over five years to Holders of Allowed Claims.

## X.

## LIQUIDATION ANALYSIS AND FEASIBILITY

### A. Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the debtor's assets are usually sold by a chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm the Plan, the Court must find that all Creditors who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a chapter 7 liquidation. The Debtor's only valuable asset is his interest in Trap Karaoke. If the case converts to chapter 7, the Debtor will cease his involvement in the operations of Trap Karaoke. The Debtor maintains that if a chapter 7 trustee were to attempt to sell the Debtor's membership interest without the ongoing involvement of the Debtor, the amount realized by the chapter 7 trustee will be significantly less than the $1,130,000 to be paid by the Debtor under the Plan. Attached as **Exhibit D** is a an expert valuation of the Debtor's interest in Trap Karaoke, LLC, assuming that the interest is sold by a chapter 7 trustee and the Debtor is no longer involved in the management of the business. The expert valuation concludes that the Debtor's liquidation value in a chapter 7 case is less than the $1,130,000 to be distributed under the Plan. For these reasons, the Debtor concludes that the Plan provides fair and equitable treatment of all Classes of Creditors and the greatest feasible recovery to all Creditors.

**B. Feasibility**

Section 1129(a)(7) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.

There are two important aspects of the feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on such date. The Debtor maintains that this aspect of feasibility is satisfied as illustrated here:

| | |
|---|---|
| Estimated Cash Debtor will have on hand on Effective Date: | $75,000 |
| Secured Claim to be paid on the Effective Date: | $0 |
| Administrative Claims due on Effective Date: | $64,406 |
| Cure Claims to be paid on the Effective Date: | $0 |
| **Balance after paying these amounts:** | **$10,594** |

The source of the Cash will be Cash in the Debtor's debtor in possession account received from Trap Karaoke. To the extent income received from Trap Karaoke is insufficient, the Debtor has exempt assets of approximately $110,000 that will be available to make required payments.

The second aspect considers whether there will be sufficient funds to make all the Plan payments required after the Effective Date, which consists of satisfaction of the Priority Tax Claims. The source of the payments will be the revenue generated by Trap Karaoke and distributed to the Debtor. Attached as **Exhibit C** is a five-year cash flow projection showing that the Debtor will generate sufficient surplus income during the period to distribute $1,167,833 to creditors pursuant to the Plan.

# XI.

# CONFIRMATION AND CONSUMMATION OF THIS PLAN

## A. Condition To Entry of the Confirmation Order.

The following are conditions precedent to the Confirmation, each of which must be satisfied, or waived in writing, by the Debtor in accordance with the terms hereof:

(a) The Plan and all schedules, documents, supplements and exhibits relating to this Plan shall have been filed in form and substance acceptable to the Debtor.

(b) The proposed Confirmation Order shall be in form and substance acceptable to the Debtor.

## B. Conditions To Effective Date.

The Debtor may request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Debtors in accordance with the terms hereof:

(a) The Confirmation Order, in form and substance satisfactory to the Debtor, shall be in full force and effect and not subject to any stay and shall, among other things, provide that the Debtor and Reorganized Debtor are authorized, without further approval or consent under the Debtor's existing organizational documents, to take all actions necessary to enter into all agreements or documents created in connection with this Plan. Without limiting the foregoing, the Debtor and the Reorganized Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

(b) All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of this Plan shall have been obtained.

(c) All other actions, documents, and agreements necessary to implement this Plan shall have been effected or executed.

(d) The Debtor shall have sufficient Cash to make all payments required to be made on the Effective Date.

**C. Waiver Of Condition.**

The Debtor may waive, in whole or in part, the conditions to the occurrence of the Effective Date, without any notice to parties in interest or the Bankruptcy Court and without a hearing. The failure to satisfy or waive any condition to the Effective Date shall preclude the occurrence of the Effective Date, regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Debtor. The waiver of a condition to the occurrence of the Effective Date shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

# XII.

# EFFECT OF PLAN CONFIRMATION

**A. Binding Effect.**

This Plan shall be binding upon and inure to the benefit of the Debtor, the Estate, all current and former Holders of Claims and Interests, and their respective successors and assigns, including the Reorganized Debtor.

**B. Revesting of Assets.**

Except as otherwise explicitly provided in this Plan, on the Effective Date, all Retained Actions and all other property comprising the Estate shall vest in the Reorganized Debtor, free and clear of all Claims, Liens, charges, encumbrances, rights, and Interests of creditors and equity security holders except for co-ownership interests, possessory liens, purchase money security interests and as otherwise set forth in the Plan. As of the Effective Date, the Reorganized Debtor may operate its business and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan or the Confirmation Order.

**C. Discharge of the Debtor.**

Upon completion of all payments under the Plan, the Debtor shall receive a discharge of all preconfirmation debts, whether or not the creditor files a proof of claim, or accepts the Plan, unless the court orders otherwise. Such discharge will not discharge Debtor from any debts that are nondischargeable under § 523 or the obligations created by this Plan.

**D. Exculpation and Limitation of Liability.**

(a) None of the Exculpated Parties shall have or incur any liability to any Entity or any Entity's respective agents, employees, representatives, advisors, attorneys, affiliates, shareholders, or members, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of this Plan, the pursuit of Confirmation of this Plan, the Confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for acts or omissions that are the result of fraud, gross negligence, criminal conduct, or willful misconduct, including the willful misappropriation of confidential information; provided, however, that the foregoing exculpation and limitation of liability shall apply only to acts and omissions that occur prior to the Effective Date, except with respect to those specific Plan administrative matters identified herein; and provided further, however, that the foregoing exculpation and limitation of liability shall not apply to and shall not operate to waive, release, or exculpate any Claims or causes of action arising from or related to the rights and obligations under this Plan and the contracts, instruments, releases, and other agreements or documents delivered hereunder or contemplated hereby and thereby. Without limiting the generality of the foregoing, the Debtor and the Reorganized Debtor shall be entitled to reasonably rely upon the advice of counsel with respect to his duties and responsibilities under this Plan.

(b) Notwithstanding any other provision herein, nothing in this Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including, without limitation, any claim arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against the Exculpated Parties, and nothing in the Plan shall enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Exculpated Parties referred to herein for any liability whatever, including without limitation, any claim, suit or action arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state or local authority, nor shall anything in this Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority, against the Exculpated Parties referred to herein.

(c) Notwithstanding any other provision herein, nothing in this Plan shall limit the liability of the Professionals of the Debtor or the Reorganized Debtor to their respective clients.

**E. Plan Default**

If the Debtor fails to make any payment required under the Plan, or to perform any other obligation required under the Plan for more than 14 days after the time specified in the Plan, the affected creditor may serve upon the Reorganized Debtor and the Reorganized Debtor's attorney a written notice of default. The Reorganized Debtor is in material default under the Plan if the Reorganized Debtor fails within 21 days of the service of such notice of default, plus 3 additional days if served by mail, either: (i) to cure the default or (ii) to obtain from the Bankruptcy Court an extension of time to cure the default or a determination that no default occurred. Creditors may not take any action to enforce either preconfirmation obligations or obligations due under the Plan, so long as the Reorganized Debtor is not in material default under the Plan. If the Reorganized Debtor is in material default under the Plan, affected creditors may: (i) take any action permitted under nonbankruptcy law to enforce the terms of the Plan; or (ii) move to dismiss this case or to convert this case to a chapter 7 bankruptcy case.

**F. Term of Bankruptcy Injunction or Stays.**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

**G. Post-Effective Date Retention of Professionals.**

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and the Reorganized Debtor may employ and pay professionals in the ordinary course of business.

## XIII.

## <u>RETENTION OF JURISDICTION</u>

**A. Retention of Jurisdiction**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, to the fullest extent permitted by law, the Bankruptcy Court shall retain jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Case and the Plan, including, among other things, jurisdiction to:

(a) resolve any matters related to the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease with respect to which the Debtor or the Reorganized Debtor may be liable, and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(b) decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving the Debtor that may be pending on the Effective Date or that are described in the Plan as may be commenced after the Effective Date;

(c) decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications, involving objections to Claims filed after the Effective Date;

(d) enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Confirmation Order;

(e) resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any entity's rights arising from, or obligations incurred in connection with, the Plan or such documents;

(f) modify the Plan before or after the Effective Date pursuant to section 1193 of the Bankruptcy Code, or remedy any defect or omission, or reconcile any inconsistency, in any Bankruptcy Court order, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, in such manner as may be necessary or appropriate to consummate the Plan;

(g) hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b) and 1129(a)(4) of the Bankruptcy Code; *provided*, *however*, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtor, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(h) issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of the Plan or the Confirmation Order;

(i) adjudicate controversies arising out of the administration of the estate or the

implementation of the Plan;

(j) recover all assets of the Debtor and property of the Estate, wherever located;

(k) hear and determine claims for relief and causes of action by or on behalf of the Debtor or the Reorganized Debtor;

(l) enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason, or in any respect, modified, stayed, reversed, revoked, or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(m) hear and resolve all matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(n) determine any other matters that may arise in connection with, or relate to, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order;

(o) enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

(p) hear and determine such other matters related hereto that are not inconsistent with the Bankruptcy Code or title 28 of the United States Code; and

(q) enter an order closing the Chapter 11 Case.

### B. Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, the provisions of this Article shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## XIV.

## MISCELLANEOUS PROVISIONS

### A. Payment Of Statutory Fees.

All U.S. Trustee Fees due and payable as of the Effective Date, plus applicable interest, if any, shall be paid by the Debtor in full on the Effective Date. The Reorganized Debtor shall be responsible for timely payment of all U.S. Trustee Fees incurred after the Effective Date.

**B. Post-Confirmation Status Report.**

Subject to any requirements set forth in the Confirmation Order or section 1106(a)(7) of the Bankruptcy Code, the Reorganized Debtor shall file, within 45 days after the Effective Date, a status report detailing the actions taken by the Debtor and the Reorganized Debtor and the progress made toward the consummation of this Plan. Reports shall be filed thereafter every six months until a final decree has been entered.

**C. Amendment Or Modification Of This Plan.**

Subject to section 1193 of the Bankruptcy Code, the Debtor reserves the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date, including, without limitation the right to withdraw the Plan; *provided, however*, that, in the event a material modification to the Plan is proposed after the Effective Date, the Reorganized Debtor shall provide notice and an opportunity to object to all interested parties. A Holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**D. Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power, upon the request of the Debtor, to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**E. Successors and Assigns.**

This Plan shall be binding upon and inure to the benefit of the Debtor and the Reorganized Debtor, and successors and assigns of the Debtor and the Reorganized Debtor. The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity.

**F. Revocation, Withdrawal, or Non-Consummation.**

The Debtor reserves the right to revoke or withdraw this Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Debtor revokes or withdraws this Plan, or if Confirmation or consummation of this Plan does not occur, then (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Class of Claims or any release contemplated hereby), assumption of Executory Contracts or Unexpired Leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (iii) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (A) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Entity, (B) prejudice in any manner the rights of the Debtor or any Entity in any further proceedings involving the Debtor, or (C) constitute an admission of any sort by the Debtor or any other Entity.

**G. Notice.**

All notices, requests, and demands to or upon the Reorganized Debtor to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by either hardcopy or electronic mail, addressed as follows:

Jason Mowatt
1200 S. Figueroa Street, Unit W3224
Los Angeles, CA 90015
Email: jason@trapkaraoke.com
Telephone: (202) 531-1704

with a copy to:

ShemanoLaw
Attn: David B. Shemano
1801 Century Park East, Suite 2500
Los Angeles, CA 90067
Email:dshemano@shemanolaw.com
Telephone: (310) 492-5033

**H. Governing Law.**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the

rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California without giving effect to the principles of conflicts of law of such jurisdiction.

**I. Tax Reporting and Compliance.**

The Reorganized Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor for all taxable periods ending after the Petition Date through, and including, the Effective Date.

Dated: October 16, 2026

JASON MOWATT

# EXHIBIT A

# EXHIBIT A– DEFINED TERMS IN THE PLAN

1.1 ***Administrative Claim*** means a Claim for costs and expenses of administration of the Chapter 11 Case under sections 503(b) or 507(b) of the Bankruptcy Code, including: (a) any actual and necessary costs and expenses, incurred on or after the Petition Date, of preserving the Estate and operating the businesses of the Debtor; (b) Professional Fee Claims; and (c) claims under section 503(b)(9) of the Bankruptcy Code.

1.2 ***Allowed*** means, with respect to any Claim, such Claim or any portion thereof that (a) the Debtor or Reorganized Debtor has assented in writing to the validity, (b) for which a proof of Claim was timely filed and has been allowed by a Final Order, (c) is allowed pursuant to the terms of this Plan, or (d) is allowed by agreement between the Holder of such Claim and the Debtor or Reorganized Debtor.

1.3 ***Allowed Amount*** means the Allowed amount of an Allowed Claim.

1.4 ***Avoidance Action*** means a claim or cause of action of the Estate or of the Debtor in its capacity as debtor in possession, exercising its rights and powers of a trustee, arising out of or maintainable pursuant to section 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b) or 553 of the Bankruptcy Code or under any other similar applicable law, regardless of whether or not such action has been commenced prior to the Effective Date.

1.5 ***Bankruptcy Code*** means title 11 of the United States Code, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Case.

1.6 ***Bankruptcy Court*** means the United States Bankruptcy Court for the Central District of California, or any other court with jurisdiction over the Chapter 11 Case.

1.7 ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended to the extent such amendments apply to the Chapter 11 Cases.

1.8 ***Business Day*** means any day, other than a Saturday, Sunday, or “legal holiday” (as defined in Bankruptcy Rule 9006(a)).

1.9 ***Cash*** means legal tender of the United States of America.

1.10 ***Chapter 11 Case*** means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor in the Bankruptcy Court.

1.11 ***Claim*** means a “claim” as defined in section 101(5) of the Bankruptcy Code.

1.12 ***Class*** means a category of Claims or Interests, as described in Article 3 hereof.

1.13 ***Confirmation*** means the confirmation of this Plan by the Bankruptcy Court

# EXHIBIT A– DEFINED TERMS IN THE PLAN

pursuant to section 1129 of the Bankruptcy Code.

1.14 ***Confirmation Date*** means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

1.15 ***Confirmation Hearing*** means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be continued from time to time.

1.16 ***Confirmation Order*** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.17 ***Co-Obligor*** means any Entity that is jointly liable with the Debtor with respect to any Claim (other than a surety with respect to an Insured Claim).

1.18 ***Creditors' Committee*** means any statutory committee of unsecured creditors appointed in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code.

1.19 ***Debtor*** means Jason Mowatt, the debtor and debtor in possession in the Chapter 11 Case.

1.20 ***Disclosure Statement*** means the disclosure statement (including all exhibits and schedules thereto) relating to this Plan, as amended, modified or supplemented from time to time.

1.21 ***Disposable Income*** means the amount of $1,130,000, the projected "disposable income" of the Debtor as defined in section 1191(d) of the Bankruptcy Code from the Effective Date through the fifth anniversary of the Effective Date.

1.22 ***Disputed Claim*** means (a) a Claim as to which the Plan Proponent has interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, or any Claim otherwise disputed by the Debtor, the Reorganized Debtor, or other party-in-interest in accordance with applicable law, which objection has not been withdrawn or determined by a Final Order, (b) a Claim scheduled by the Debtor as contingent, unliquidated, or disputed, (c) a Claim which amends a Claim scheduled by the Debtor as contingent, unliquidated, or disputed, (d) a Claim described in the Plan or the Disclosure Statement as disputed, or (e) a Claim prior to its having become an Allowed Claim.

1.23 ***Disallowed*** means, with respect to any Claim, such Claim or any portion thereof that (a) has been disallowed by an order or judgment of the Bankruptcy Court or other court in which the merits of the Claim were adjudicated pursuant to the Plan, (b) disallowed pursuant to the terms of this Plan, or (c) disallowed by agreement between the Holder of such Claim and the Debtor or Reorganized Debtor.

# EXHIBIT A– DEFINED TERMS IN THE PLAN

1.24 ***Effective Date*** means a Business Day on or after the Confirmation Date specified by the Debtor on which (a) no stay of the Confirmation Order is in effect and (b) the conditions to effectiveness set forth in Article 8.2 hereof have been satisfied or waived.

1.25 ***Entity*** means an "entity" as defined in section 101(41) of the Bankruptcy Code.

1.26 ***Estate*** means the estate of the Debtor created under section 541 of the Bankruptcy Code.

1.27 ***Exculpated Parties*** means (a) the Plan Proponent, (b) any insider or affiliate of the Plan Proponent, and (c) the present directors, officers, managers, employees, legal advisors and other professionals of (a) through (b) (in their capacity as such).

1.28 ***Executory Contract*** means a contract (a) that is "executory" for purposes of section 365 of the Bankruptcy Code and (b) to which the Debtor is a party as of the commencement of the Chapter 11 Case.

1.29 ***Exhibit*** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement, as amended, modified or supplemented from time to time.

1.30 ***Final Order*** means an order or judgment, the operation or effect of which has not been reversed, stayed, modified, or amended, and as to which order or judgment (or any reversal, stay, modification, or amendment thereof) (a) the time to appeal, seek certiorari, or request reargument or further review or rehearing has expired and no appeal, petition for certiorari, or request for reargument or further review or rehearing has been timely filed, or (b) any appeal, that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed, has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought, or to which the request was made, and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken for granted.

1.31 ***General Unsecured Claim*** means a Claim against the Debtor that is not an Administrative Claim, Insured Claim, Non-Tax Priority Claim, Priority Tax Claim, Secured Claim, or Subordinated Claim.

1.32 ***Holder*** means a holder of a Claim or Interest, as applicable, or such holder's designee.

1.33 ***Impaired*** means, when used in reference to a Claim, a Claim that is in a Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.34 ***Insider*** means an "insider" as defined in section 101(31) of the Bankruptcy Code.

# EXHIBIT A– DEFINED TERMS IN THE PLAN

1.35 ***Insured Claim*** means a Claim against a Debtor that is covered by insurance or an indemnity policy, agreement, bond or right maintained by or for the benefit of such Debtor, but only to the extent of coverage or liability under the insurance or indemnity policy, agreement, bond or right.

1.36 ***Interest*** means the legal, equitable, contractual (including any contractual right to acquire equity in a Debtor contingent upon future events, such as an initial public offering) and other rights of any Entity with respect to any ownership interest in a Debtor, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor, including membership interests in limited liability companies regardless of whether such membership interests have any voting rights under the applicable operating agreement.

1.37 ***Lien*** means a lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

1.38 ***Non-Tax Priority Claim*** means a Claim, other than an Administrative Claim or Priority Tax Claim, which is entitled to priority in payment pursuant to section 507(b) of the Bankruptcy Code.

1.39 ***Person*** means a "person" as defined in section 101(41) of the Bankruptcy Code.

1.40 ***Petition Date*** means January 15, 2026.

1.41 ***Plan*** means this chapter 11 plan of reorganization, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be amended, modified or supplemented from time to time.

1.42 ***Plan Proponent*** means the Debtor.

1.43 ***Priority Tax Claim*** means a Claim of a governmental unit of the kind specified in sections 502(i), 507(a)(8), or 1129(a)(9)(D) of the Bankruptcy Code.

1.44 ***Professional*** means (a) a professional employed in the Chapter 11 Case pursuant to section 327, 328, or 1103 of the Bankruptcy Code or otherwise, and (b) a professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to section 503(b)(4) of the Bankruptcy Code.

1.45 ***Professional Fee Claim*** means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred on or after the Petition Date and prior to and including the Effective Date.

# EXHIBIT A– DEFINED TERMS IN THE PLAN

1.46 ***Pro Rata Share*** means, with respect to a Claim or a Class of Claims, the percent that is equal to the fraction whose numerator is the amount of the particular Claim under consideration and whose denominator is the aggregate amount of all Claims of the same nature and Class, and, with respect to a Class of Interests, the percentage that is equal to the fraction whose numerator is the number of shares or other Interests held by a particular Holder and the denominator of which is the aggregate number of shares or interests of the same nature and Class held by all Holders.

1.47 ***Reinstated*** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave the Class including such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before, on or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, (iii) compensating the holder of a Claim for any damages incurred as a result of any reasonable reliance by such holder of a Claim on such contractual provision or such applicable law, and (iv) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim; *provided*, *however*, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions, change of control or actions contemplated by this Plan, or conditioning such transactions or actions on certain factors, shall not be required to be cured to achieve reinstatement.

1.48 ***Reorganized Debtor*** means, with respect to the Debtor, the successor to the Debtor on and after the Effective Date.

1.49 ***Retained Actions*** means all claims, causes of action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which the Debtor, in its capacity as debtor or in its capacity as debtor in possession, the Estate, or the Reorganized Debtor may hold against any Entity, including: (a) claims and causes of action brought prior to or after the Effective Date, (b) claims and causes of action seeking the recovery of any of the Debtor's or the Reorganized Debtor's rights to payment created or arising in the ordinary course of business, including claim overpayments and tax refunds, and (c) all Avoidance Actions.

1.50 ***Secured Claim*** means a Claim that is secured by a Lien on property in which the Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a)

# EXHIBIT A– DEFINED TERMS IN THE PLAN

of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

1.51 ***Subordinated Claim*** means a Claim subject to subordination under section 510(b) or (c) of the Bankruptcy Code.

1.52 ***Subsidiary*** of any Entity means (a) a corporation more than 50% of the combined voting power of the outstanding voting stock of which is owned, directly or indirectly, by such Entity or by one of more other Subsidiaries of such Entity or by such Entity and one or more other Subsidiaries thereof; (b) a partnership of which such Entity, or one or more other Subsidiaries of such Entity or such Entity and one or more other Subsidiaries thereof, directly or indirectly, is the general partner and has the power to direct the policies, management and affairs of such partnership; (c) a limited liability company of which such Entity or one or more other Subsidiaries of such Entity or such Entity and one or more other Subsidiaries thereof, directly or indirectly, is the managing member and has the power to direct the policies, management and affairs of such company; or (d) any other Entity (other than a corporation, partnership or limited liability company) in which such Entity, or one or more other Subsidiaries of such Entity or such Entity and one or more other Subsidiaries thereof, directly or indirectly, has at least a majority ownership and has the power to direct the policies management and affairs thereof. For the purposes of this definition, "voting power" shall mean the right to elect a majority of the board of directors of such corporation.

1.53 ***Unclassified Claims*** means Administrative Claims and Priority Tax Claims.

1.54 ***Unexpired Lease*** means a lease (a) that is "executory" for purposes of section 365 of the Bankruptcy Code, and (b) to which the Debtor is a party as of the commencement of the Chapter 11 Case.

1.55 ***Unimpaired*** means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.56 ***U.S. Trustee Fees*** means all fees and charges assessed against the Estate under section 1930 of title 28 of the United States Code.

***Rules Of Interpretation And Computation Of Time***. For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions with any modifications subject to the consent of the Plan Proponents; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such

document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns, and any reference to an entity in other contexts includes that entity's predecessors; (e) all references in this Plan to Articles and Sections are references to Articles and Sections of or to this Plan, unless otherwise indicated; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without limitation;" and (l) with reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

# EXHIBIT B

**EXHIBIT B – PRIORITY TAX CLAIMS**

| **State** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **TOTAL** |
|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,483 | 5,170 | 8,653 |
| Arizona | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,228 | 13,228 |
| Arkansas | 0 | 0 | 0 | 0 | 0 | 0 | 11,102 | 9,529 | 10,944 | 31,575 |
| California | 7,591 | 8,626 | 10,833 | 0 | 2,561 | 2,852 | 0 | 3,964 | 0 | 36,427 |
| Colorado | 0 | 0 | 0 | 0 | 0 | 0 | 3,250 | 0 | 3,994 | 7,244 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,916 | 5,772 | 13,688 |
| Delaware | 0 | 0 | 0 | 0 | 3,935 | 0 | 0 | 0 | 0 | 3,935 |
| Florida | 1,806 | 0 | 0 | 0 | 0 | 0 | 0 | 21,317 | 38,462 | 61,585 |
| Georgia | 0 | 14,871 | 11,170 | 0 | 10,965 | 0 | 0 | 29,798 | 55,416 | 122,220 |
| Illinois | 5,597 | 7,799 | 12,034 | 0 | 9,436 | 14,294 | 23,282 | 0 | 0 | 72,442 |
| Indiana | 0 | 0 | 0 | 0 | 0 | 0 | 8,974 | 10,840 | 5,065 | 24,879 |
| Kentucky | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,843 | 1,595 | 3,438 |
| Louisiana | 2,166 | 7,188 | 12,073 | 3,631 | 5,808 | 0 | 0 | 0 | 23,245 | 54,111 |
| Maryland | 0 | 0 | 5,678 | 2,628 | 9,623 | 0 | 10,612 | 11,597 | 14,303 | 54,441 |
| Massachusetts | 0 | 0 | 0 | 0 | 0 | 0 | 4,012 | 0 | 0 | 4,012 |
| Michigan | 0 | 6,584 | 7,047 | 0 | 0 | 0 | 9,356 | 15,483 | 17,009 | 55,479 |
| Minnesota | 0 | 0 | 0 | 0 | 0 | 0 | 7,361 | 6,613 | 0 | 13,974 |
| Missouri | 0 | 0 | 1,235 | 0 | 0 | 0 | 17,399 | 13,887 | 14,360 | 46,881 |
| Nevada | 0 | 0 | 5,028 | 0 | 2,269 | 0 | 0 | 0 | 0 | 7,297 |
| New Jersey | 0 | 0 | 0 | 0 | 0 | 0 | 14,574 | 15,810 | 16,171 | 46,555 |
| New York | 5,680 | 5,308 | 6,131 | 0 | 0 | 0 | 0 | 0 | 0 | 17,119 |
| North Carolina | 3,899 | 5,043 | 11,413 | 0 | 0 | 0 | 32,847 | 27,896 | 27,180 | 108,278 |
| Ohio | 6,290 | 0 | 3,017 | 0 | 0 | 1,406 | 3,423 | 0 | 29,477 | 43,613 |
| Pennsylvania | 2,544 | 0 | 6,714 | 0 | 0 | 0 | 24,673 | 24,194 | 4,534 | 62,659 |
| South Carolina | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,020 | 3,925 | 7,945 |
| Tennessee | 4,900 | 2,730 | 13,076 | 0 | 8,280 | 0 | 4,594 | 23,130 | 27,468 | 84,178 |
| Texas | 9,937 | 7,188 | 10,214 | 0 | 7,696 | 0 | 0 | 19,664 | 44,779 | 99,478 |
| Virginia | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,274 | 4,274 |
| Washington DC | 8,360 | 5,684 | 6,061 | 0 | 0 | 0 | 0 | 0 | 0 | 20,105 |
| **TOTAL** | 58,770 | 71,021 | 121,724 | 6,259 | 60,573 | 18,552 | 175,459 | 250,984 | 366,371 | **1,129,713** |

# EXHIBIT C

Jason Mowatt
Cash Flow Projection

| Trap Karaoke | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | Notes |
|---|---|---|---|---|---|---|---|---|
| **Gross Revenue** | 6,303,555 | 6,625,000 | 6,956,250 | 7,304,063 | 7,669,266 | 8,052,729 | 8,455,365 | Annual growth of 5% |
| Less: Sales Tax | (368,000) | (386,400) | (405,720) | (426,006) | (447,306) | (469,672) | (493,155) | Annual growth of 5% |
| **Net Revenue** | 5,935,555 | 6,238,600 | 6,550,530 | 6,878,057 | 7,221,959 | 7,583,057 | 7,962,210 | |
| **Expenses** | | | | | | | | |
| Subcontractors | (1,198,819) | (1,250,000) | (1,312,500) | (1,378,125) | (1,447,031) | (1,519,383) | (1,595,352) | Annual increases of 5% |
| Merchandise Purchases | (133,179) | (135,000) | (141,750) | (148,838) | (156,279) | (164,093) | (172,298) | Annual increases of 5% |
| Rents | (1,489,205) | (1,600,000) | (1,680,000) | (1,764,000) | (1,852,200) | (1,944,810) | (2,042,051) | Annual increases of 5% |
| Interest | (81,375) | (40,000) | - | - | - | - | - | |
| Computers & equipment Purchases | (41,193) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | Keeping flat |
| Advertising | (1,863,603) | (1,970,000) | (1,930,600) | (1,891,988) | (1,854,148) | (1,817,065) | (1,780,724) | Look to decrease Meta advertising expenses 2% per year starting in 2027 |
| Travel | (698,014) | (760,000) | (798,000) | (837,900) | (879,795) | (923,785) | (969,974) | Annual increases of 5% |
| Professional fees | (436,998) | (250,000) | (125,000) | (131,250) | (137,813) | (144,703) | (151,938) | Annual increases of 5%, after elim. Litigation expenses |
| Sales Tax Consultants | - | - | (50,000) | (15,000) | - | - | - | Fees to complete sales tax settlements |
| Website and Computer Expenses | (61,710) | (65,000) | (68,250) | (71,663) | (75,246) | (79,008) | (82,958) | Annual increases of 5% |
| Insurance | (42,555) | (45,000) | (47,250) | (49,613) | (52,093) | (54,698) | (57,433) | Annual increases of 5% |
| Event Research | (16,412) | (17,000) | (17,850) | (18,743) | (19,680) | (20,664) | (21,697) | Annual increases of 5% |
| Financing, Bank and Merchant Fees | (20,431) | (7,000) | (7,350) | (7,718) | (8,103) | (8,509) | (8,934) | Annual increases of 5% (remove Stripe loan fee from 2025) |
| Other Misc Expenses | (12,298) | (12,000) | (12,600) | (13,230) | (13,892) | (14,586) | (15,315) | Annual increases of 5% |
| **Total Expenses** | (6,095,792) | (6,176,000) | (6,216,150) | (6,353,066) | (6,521,280) | (6,716,303) | (6,923,674) | |
| Taxable Income (Loss) | (160,237) | 62,600 | 334,380 | 524,991 | 700,680 | 866,754 | 1,038,536 | |
| Less: | | | | | | | | |
| State Income Taxes | - | (5,008) | (26,750) | (41,999) | (56,054) | (69,340) | (83,083) | 8% tax rate on taxable income |
| **Net Cash Flow from Trap Karaoke** | (160,237) | 57,592 | 307,630 | 482,992 | 644,625 | 797,414 | 955,453 | |

**Jason Mowatt**

| | | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | Notes |
|---|---|---|---|---|---|---|---|---|---|
| Cash flow from Trap Karaoke | | (160,237) | 57,592 | 307,630 | 482,992 | 644,625 | 797,414 | 955,453 | |
| Housing | | (72,960) | (72,960) | (76,608) | (80,438) | (84,460) | (88,683) | (93,118) | Annual increase of 5% |
| Home Maintenance | | (3,000) | (3,000) | (3,150) | (3,308) | (3,473) | (3,647) | (3,829) | Annual increase of 5% |
| Food and housekeeping | | (18,000) | (18,000) | (18,900) | (19,845) | (20,837) | (21,879) | (22,973) | Annual increase of 5% |
| Personal care | | (4,800) | (4,800) | (5,040) | (5,292) | (5,557) | (5,834) | (6,126) | Annual increase of 5% |
| Medical and Dental | | (3,600) | (3,600) | (3,780) | (3,969) | (4,167) | (4,376) | (4,595) | Annual increase of 5% |
| Transportation | | (18,000) | (18,000) | (18,900) | (19,845) | (20,837) | (21,879) | (22,973) | Annual increase of 5% |
| Health Insurance | | (10,800) | (10,800) | (11,340) | (11,907) | (12,502) | (13,127) | (13,784) | Annual increase of 5% |
| Utilities | | (1,572) | (1,572) | (1,651) | (1,733) | (1,820) | (1,911) | (2,006) | Annual increase of 5% |
| Income Taxes (at 40%) | | - | (18,717) | (118,516) | (188,434) | (252,849) | (313,715) | (376,668) | Actual calculated at 40% |
| Net Cash Flow before sales tax payments | | (292,969) | (93,857) | 49,745 | 148,221 | 238,122 | 322,363 | 409,382 | Total of $1,167,833 for 2027-2031 |
| Accrued Sales Tax - Historical | (1,150,000) | | | (49,745) | (148,221) | (238,122) | (322,363) | (391,549) | Total of $1,150,000 |
| Excess Cash Flow | | | | - | - | - | - | 17,833 | |

| **Calculation of Income Taxes:** | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 |
|---|---|---|---|---|---|---|---|
| Taxable Income - Current Year | (171,037) | 46,792 | 296,290 | 471,085 | 632,123 | 784,286 | 941,670 |
| Deduction for Sales Tax Payments Not Deducted as of 12/31/25 | | | - | - | - | - | - |
| Loss Carryover - 2024 | (287,773) | - | - | - | | | |
| Loss Carryover Utilized -2025 | | | | | | | |
| Section 357(c) Gain on S corp conversion | 525,000 | | | | | | |
| Taxable Income | 66,190 | 46,792 | 296,290 | 471,085 | 632,123 | 784,286 | 941,670 |
| Income Taxes (at 40%) | 20,600 | 18,717 | 118,516 | 188,434 | 252,849 | 313,715 | 376,668 |

Footnote re: NOL - Trap Karaoke converted from a sole proprietorship (Schedule C on Jason's personal 1040) to an S corporation effective 1/1/2025. As a result of the S corporation election, income was triggered due to the liabilities of the business exceeding the tax basis of the assets. As a result, the net operating loss from 2024 is fully utilized on the 2025 tax return.
Actual taxes owed for 2025 are reported above of $20,600.

# EXHIBIT D

**KEVIN F. HENRY** **Principal**

Mr. Henry is a principal with the firm of Freeman & Mills, a consulting firm offering services in the areas of accounting, finance, economics and business practices and procedures. Mr. Henry joined Freeman & Mills in April 2001, having been previously employed with a predecessor firm, Freeman & Mills, Incorporated in 1990-1992.

Prior to returning to Freeman & Mills, Mr. Henry spent three years as a Director with ANZ Investment Bank, the investment banking division of the Australia and New Zealand Banking Group Limited. Based in Sydney, Australia, Mr. Henry co-founded the Business Sales and Acquisitions group, and acted as a financial advisor on mergers, acquisitions and divestitures, and other corporate finance engagements with a particular focus on privately held companies.

Mr. Henry was transferred to Sydney from Los Angeles in 1994 with Arthur Andersen, and held successive positions as Manager and Associate Director in the Corporate Finance group. Mr. Henry provided corporate finance advice to both public and private companies, as well as independent expert's advice on transactions as required by the Australian Securities Commission.

Mr. Henry has extensive experience in securities and business valuations, transaction structuring and negotiation, capital raising, and other corporate finance advice. Mr. Henry has particular expertise in the financial services, commercial real estate development, manufacturing, distribution, and media/entertainment/telecommunications industries. Mr. Henry's international experience includes companies in Australia, New Zealand, Singapore, Japan, United Kingdom, and South Africa.

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1998–2001 | Director, ANZ Investment Bank, Sydney, Australia |
| 1994–1997 | Associate Director, Arthur Andersen Corporate Finance, Sydney, Australia |
| 1993–1994 | Manager, Arthur Andersen, Los Angeles |
| 1990–1993 | Professional Staff Position, Freeman & Mills, Inc., Los Angeles |
| 1989–1990 | Professional Staff Position, Willamette Management Associates, Portland, Oregon |

## PROFESSIONAL AFFILIATIONS AND MEMBERSHIPS

- CFA Institute, Member
- California Society of CPAs, Business Valuation Section, Associate Member
- American Bar Association, Associate Member, Business Law and Litigation

Mr. Henry holds a BS in Business and Administrative Studies from Lewis & Clark College, Portland, Oregon.

## CONTACT:

(213) 576-1816
khenry@freemanmills.com

# In re: Trap Karaoke, LLC – Valuation of Membership Interest

*October 16, 2026*

I have been asked to provide a valuation of the equity of Trap Karaoke, LLC for purposes of sale or liquidation under Chapter 7 of the US Bankruptcy Code. The valuation conclusion is for 100% of the common equity on a fair market value basis as of the date of this report.

Fair market value is defined as:

> "The amount at which the property would change hands between a willing buyer and willing seller, when the former is not under any compulsion to buy, and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts."[1]

In my opinion, the fair market value of a 100% membership interest in Trap Karaoke, LLC, under either a going-concern sale to a hypothetical purchaser (¶¶ 7–20) or a liquidation of the LLC's assets (¶ 21), is no more than:

**($1,310,000)**

**Comments:**

1. Trap Karaoke, LLC (together with its predecessor operation) is a hip-hop-karaoke live event and touring business, producing 70 events annually.[2] Jason Mowatt is its sole member.[3]

2. The following table summarizes the last five years' revenues and reported net income:[4]

[1] IRS Revenue Ruling 59-60.
[2] Periodic Report Regarding Value, Operations, and Profitability (Form 426), Trap Karaoke LLC business description.
[3] Schedules of Assets and Liabilities, Part 4 (interests in business entities); Periodic Report, Trap Karaoke LLC cover page.
[4] See Tab 4 for a summary of the historic income statements.




*Figure 1: Trap Karaoke, LLC — Total Revenue and Net Income, 2021–2025.*

3. As of December 31, 2025, Trap Karaoke, LLC's balance sheet reflects total assets of $138,321.97 and total liabilities of $1,503,950.08, a members' equity deficit of $1,365,628.11 (= $138,321.97 − $1,503,950.08).[5]

4. Mr. Mowatt is also the sole member of UGX, LLC, a non-operating holding company that is in turn the sole member of UGX Brands, LLC.[6] UGX Brands, LLC is described in the Debtor's periodic report as developing, maintaining, and holding title to certain intellectual property, including trademarks, that it licenses to Trap Karaoke, LLC; no license fee has been charged or paid under that license in any of the five years covered by the income statements.[7]

5. I have assumed these three membership interests (or the business assets therein) would likely be marketed and sold together as a package.[8] UGX Brands, LLC's balance sheet as of December 31, 2024 reflects $0 total assets and $0 total liabilities, comprising a $53,925.00 member capital contribution fully offset by a $53,925.00 accumulated deficit (net members' equity: $0); its 2024 Schedule C reflects a loss of $53,925.00 for the year.[9] Based on these figures, I have not included separate value for UGX, LLC or UGX Brands, LLC.

---

[5]See Tab 5 for historic balance sheets.
[6]Periodic Report, UGX LLC and UGX Brands LLC business descriptions and ownership charts.
[7]Periodic Report, Trap Karaoke LLC and UGX Brands LLC Exhibit B/C narrative.
[8]Communication from counsel, referencing the Debtor's February 2026 periodic report.
[9]UGX Brands LLC balance sheet as of December 31, 2024 and related Schedule C, as provided by the client. No separate financial statements are available for UGX, LLC.

6. Trap Karaoke, LLC and UGX Brands, LLC are co-plaintiffs in a pending trademark-infringement action against third parties, filed July 31, 2024.[10] I have treated this litigation as a contingent asset for purposes of this analysis and have assigned it $0 value, pending its outcome.

**Analysis:**

7. I have valued a 100% interest in Trap Karaoke, LLC using the market approach and the asset approach.

8. For the market approach, I have estimated normalized revenues for 2026 based on annualized year-to-date revenues of $4.4 million through August 2026 ($4.4 million ÷ 8 = $550,000 x 12 = $6.6 million)[11], and note that this amount is consistent with projected gross revenues of $6.625 million in the 5-Year Cash Flow Projection prepared by Mr. Mowatt. Deducting estimated sales tax on that amount gives net revenues of $6,238,600.[12]

9. The 5-Year Cash Flow projection reflects a Seller's Discretionary Earnings ("SDE")[13] margin[14] of 0.92% in 2026, 4.70% in 2027, 7.02% in 2028, 8.93% in 2029, 10.52% in 2030, and 12.00% in 2031, with an average of 7.35%, which I have rounded to 7.00%. Applying this 7.00% margin to the $6,238,600 projected net revenue yields normalized earnings of $436,702.[15]

10. I have also calculated projected EBITDA by subtracting projected compensation for Mr. Mowatt per the same projections. For 2026, a total of $132,732 in expenses are projected for Mr. Mowatt — projected EBITDA is $303,970.[16]

11. I have sourced small-business acquisition multiples from the IBBA (International Business Brokers Association) and M&A Source "Market Pulse Survey" for the second quarter of 2026, a quarterly survey of business brokers and M&A advisors regarding recently closed transactions.[17] For completed transactions with a deal size of $1,000,000 to $2,000,000, this survey reports a median multiple of 3.1x SDE; for completed

---

[10]Complaint, Trap Karaoke, LLC and UGX Brands, LLC v. City of Norfolk d/b/a Seven Venues, et al., originally filed in the U.S. District Court for the Southern District of New York and subsequently transferred to the U.S. District Court for the Eastern District of Virginia.
[11]$4.4 million through August 2026. $4.4 million/8 = $550,000 x 12 = $6.6 million.
[12]Jason Mowatt 5-Year Cash Flow Projection. $6,625,000 − $386,400 = $6,238,600.
[13]SDE is the cash flow available to an owner/operator of a business, combining both compensation and return on equity. It is functionally equivalent to Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA) plus owner's total compensation.
[14]SDE/Net Revenues.
[15]$6,238,600 × 7.00% = $436,702.
[16]$436,702 SDE - $132,732 Compensation = $303,970.
[17]IBBA and M&A Source, Market Pulse Survey, Q2 2026.

transactions with a deal size between $2M-$5M the survey reports a 4.0x multiple on an EBITDA basis.[18]

12. The following chart summarizes the application of the IBBA transaction multiples to the relevant earnings measure to estimate enterprise value before adjustments:[19]

| | Multiple | Earnings | Indicated EV | Matching Band? |
|---|---|---|---|---|
| <$500K deal size | 2.00x | $436,702 | $873,404 | No |
| $500K-$1M deal size | 2.80x | $436,702 | $1,222,766 | No |
| $1M-$2M deal size | 3.10x | $436,702 | $1,353,776 | Yes |
| $2M-$5M deal size (EBITDA basis) | 4.00x | $303,970 | $1,215,880 | No |
| $5M-$50M deal size (EBITDA basis) | 5.80x | $303,970 | $1,763,026 | No |

*Table summarizing application of IBBA transaction multiples to estimated enterprise value, before adjustments.*

13. Note that only the 3.1x valuation returns a positive internal consistency. On that basis, the enterprise value for the business, before adjustments, is $1,353,776. Also note that this value is based on SDE, which, as earlier, represents the capitalized value of all returns to an owner/operator.

14. The financial projections referenced above assume continued involvement by Jason Mowatt. However, in a sale situation, Mr. Mowatt's various roles would need to be provided by one or more replacement personnel across the seven separate functions he has described performing for the business[20]:

- Chief Executive Officer/President (overall company strategy, financial decisions, major partnerships, vendor and agency management, and key operating decisions)
- Executive Producer (oversight of the live show format, segment development, creative direction, audience experience, and consistency across markets)
- Show Director (managing the show's flow and performance, including pacing, transitions, timing, audience energy, and performer execution)
- Performer/On-Stage Talent (Mr. Mowatt is also part of the live performance itself)
- Booking Director (market selection, venue sourcing, routing, venue negotiations, deal structure, and calendar strategy)

---

[18] Id.
[19] SDE or EBITDA capitalized at the relevant multiple. If the capitalized value falls within the value band for which the multiple is applicable, the result is internally consistent. Only the 3.1x SDE meets this criterion.
[20] Email from Jason Mowatt to Kevin F. Henry, October 2, 2026 ("My responsibilities span several functions that would likely need to be replaced by approximately seven separate roles if I were no longer involved (3 of which would require additional travel/onsite)").

- Head of Growth/Marketing (ticket sales strategy, paid media, campaign structure, marketing budgets, funnel strategy, and related customer acquisition strategy)
- Creative Director/Content Lead (brand direction, advertising concepts, creative strategy, copy, campaign messaging, and social content)

For indicia of the cost of replacing each of these functions, I have referenced U.S. Bureau of Labor Statistics ("BLS") Occupational Employment and Wage Statistics ("OEWS") national wage data for the closest corresponding occupational classification to each role, adopting the 10th percentile of each occupation's national wage distribution — rather than a higher percentile — in light of Trap Karaoke's scale as a small, founder-operated business well below the size of the establishments typically reflected in the broader cross-section of each occupation.[21] The following chart summarizes the national 10th-percentile-to-median wage range for each role's closest BLS occupational proxy:




[21] U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics (OEWS), National estimates, May 2025 (the most recent published release, May 15, 2026). BLS OEWS wage data is published at the national, state, and metropolitan-area level and by industry sector, but is not broken out by establishment size.

*Figure 2: Replacement-Cost Range by Function — BLS Occupational Proxy, National 10th Percentile to Median.*

15. Summing the national 10th-percentile wage for each of the seven roles described in ¶ 14 yields an aggregate indicative replacement cost of $379,140.[22] I have adopted the 10th-percentile figure because Trap Karaoke's scale as a small, founder-operated business makes the lower end of each occupation's national wage distribution the more representative benchmark for replacement candidates. Deducting this $379,140 estimated replacement cost from the $436,702 SDE described in ¶ 9 yields an adjusted SDE of $57,562.[23]

16. The following chart summarizes the application of the same IBBA transaction multiples described in ¶ 11 to the adjusted SDE and adjusted EBITDA described in ¶¶ 14–15, to estimate enterprise value after the key-person cost adjustment:[24]

| | Multiple | Earnings | Indicated EV | Matching Band? |
|---|---|---|---|---|
| <$500K deal size | 2.00x | $57,562 | $115,124 | Yes |
| $500K-$1M deal size | 2.80x | $57,562 | $161,174 | No |
| $1M-$2M deal size | 3.10x | $57,562 | $178,442 | No |
| $2M-$5M deal size (EBITDA basis) | 4.00x | ($75,170) | $0 | No |
| $5M-$50M deal size (EBITDA basis) | 5.80x | ($75,170) | $0 | No |

Only the 2.00x valuation returns a positive internal consistency on this adjusted basis. The indicated enterprise value for the business, after adjustments, is accordingly $115,124 — a decline of $1,238,652 from the $1,353,776 indicated enterprise value before adjustment described in ¶ 13.[25]

17. Two additional factors would further increase the risk to a hypothetical purchaser. First, Trap Karaoke operates on a forward calendar of already-booked events at any given point in time; a change in ownership or operator would need to be managed against that existing pipeline of commitments — including venue contracts and ticket sales already collected — without disruption, or the business may face event cancellations and associated customer refunds, chargebacks, or venue-contract liabilities, with the associated impact on goodwill. Industry data indicate that transactions of this size

[22] $34,320 (Performer/On-Stage Talent) + $45,780 (Show Director) + $45,780 (Executive Producer) + $50,090 (CEO/President) + $48,010 (Booking Director) + $90,260 (Head of Growth/Marketing) + $64,900 (Creative Director/Content Lead) = $379,140. The corresponding sum of national median wages for the same seven roles is $711,444.

[23] $436,702 − $379,140 = $57,562.

[24] Same internal-consistency test described in ¶ 12, n. 19, applied here to the adjusted earnings measures: SDE or EBITDA, as adjusted, capitalized at the relevant multiple; the result is internally consistent only if the capitalized value falls within the deal-size band for which the multiple is applicable.

[25] $1,353,776 − $115,124 = $1,238,652.

typically take approximately 6 months to close.[26] A sale process of that length increases the period during which the business's revenue and the vendor, venue, and customer relationships identified in ¶ 14 would need to continue to be maintained without Mr. Mowatt's direct involvement, and during which the pipeline risk described above would need to be managed.

18. Trap Karaoke, LLC's balance sheet, as of December 31, 2025, reflects total liabilities of $1,503,950.08 (¶ 3). I am informed that the $80,752.00 note payable to NewCo Capital Group has since been paid in full; excluding it, I have treated the remaining $1,423,198.08 of claims as a waterfall against any sale proceeds. The following table summarizes that waterfall:[27]

| Claim | Amount |
|---|---:|
| Accrued sales tax payable | $1,156,146.10 |
| Credit card balances (American Express $164,565.16 + Capital One Venture $2,486.82) | $167,051.98 |
| Loan — Joan Mowatt Palmer | $100,000.00 |
| **Total** | **$1,423,198.08** |

Netting the $115,124 indicated enterprise value described in ¶ 16 against this $1,423,198.08 of total claims yields an indicated shortfall — that is, a negative indicated value of the membership interest — of ($1,308,074.08).[28]

19. I have also tested the sensitivity of the ¶ 18 conclusion to a reduction in normalized revenue, to address the risk that a hypothetical purchaser could not immediately replace Mr. Mowatt's role in the business, including his vendor, venue, and marketing relationships developed over approximately ten years of operating Trap Karaoke. This test is in addition to the role-replacement cost adjustment in ¶¶ 14–15: the replacement-cost adjustment addresses the cost of immediately filling Mr. Mowatt's specific functional roles, while the revenue-reduction test addresses the separate risk that a hypothetical buyer, even having filled those roles, may not seamlessly retain the revenue generated by Mr. Mowatt's own tenure, relationships, and reputation in the industry. I have tested three scenarios in which the $6,238,600 normalized net revenue described in ¶ 8 is reduced by 10%, 20%, and 30%, holding the 7.00% margin (¶ 9) and the replacement-cost deduction (¶ 15) constant, and recomputed the resulting SDE, adjusted

[26]IBBA and M&A Source, Market Pulse Survey (2025), reporting an average time-to-close of six months for deals under $500,000.
[27]Trap Karaoke Balance Sheet as of December 31, 2025, reflecting total liabilities of $1,503,950.08, including an $80,752.00 note payable to NewCo Capital Group. I am informed that this note has been paid in full subsequent to December 31, 2025, and have excluded it here: $1,156,146.10 + $164,565.16 + $2,486.82 + $100,000.00 = $1,423,198.08.
[28]$115,124 − $1,423,198.08 = ($1,308,074.08).

SDE, indicated enterprise value (at the internally consistent multiple for each result), and indicated shortfall at each level. The following table summarizes the results:[29]

| Scenario | Net Revenue | SDE (7.00%) | Adjusted SDE | Indicated EV | Shortfall |
|---|---|---|---|---|---|
| Base case | $6,238,600.00 | $436,702.00 | $57,562.00 | $115,124.00 | ($1,308,074.08) |
| 10% reduction | $5,614,740.00 | $393,031.80 | $13,891.80 | $27,783.60 | ($1,395,414.48) |
| 20% reduction | $4,990,880.00 | $349,361.60 | ($29,778.40) | $0.00 | ($1,423,198.08) |
| 30% reduction | $4,367,020.00 | $305,691.40 | ($73,448.60) | $0.00 | ($1,423,198.08) |

20. Across each of these scenarios, the indicated enterprise value is in every case less than the $1,156,146.10 accrued sales tax payable claim alone (¶ 18); the credit card balances and the Joan Mowatt Palmer loan (the two remaining claims, following the NewCo Capital Group note payoff described in ¶ 18) accordingly recover $0.00 in every scenario tested, including the liquidation cross-check described in ¶ 21. The chart below summarizes the recovery rate, in cents per dollar of claim, on the sales tax payable claim alone, by scenario:




*Figure 3: Trap Karaoke, LLC — Sales Tax Payable, Recovery Rate by Scenario.*

21. As a cross-check using a different methodology — liquidation recovery rates applied to each balance-sheet asset, rather than a capitalized-earnings approach — I also considered

[29] At the 10% reduction level, adjusted SDE remains positive and the 2.00x multiple remains the only internally consistent result; at the 20% and 30% reduction levels, adjusted SDE is negative, so no multiple yields a positive capitalized value and indicated enterprise value is $0.

liquidation of Trap Karaoke, LLC's balance-sheet assets, summarized in the following table:

| Asset | Net Book Value | Recovery % | Recovered Value |
|---|---|---|---|
| Cash | $43,214.48 | 100% | $43,214.48 |
| Investment in Wefunder | $2,640.00 | 0% | $0.00 |
| Equipment and related assets | $92,467.49 | 25% | $23,116.87 |
| **Total** | **$138,321.97** | | **$66,331.35** |

Netting this $66,331.35 total liquidation value against the $1,423,198.08 of total claims described in ¶ 18 (post NewCo Capital Group payoff) yields an indicated shortfall of ($1,356,866.73).[30] Under an asset sale approach, there would be a recovery of 5.74 cents per dollar on the sales tax payable claim, with all other claims recovering $0.00 (¶ 20).

22. In my opinion, the fair market value of Mr. Mowatt's membership interest in Trap Karaoke, LLC is negative as of the date of this analysis:

- under the going-concern approach described in ¶¶ 7–20 - ($1,308,074.08) – round to ($1,310,000); and
- under the asset liquidation approach described in ¶ 21 - ($1,356,866.73) – round to ($1,360,000).

Respectfully submitted,

Kevin F. Henry
Freeman & Mills, Inc.
October 16, 2026

[30] Trap Karaoke Balance Sheet as of December 31, 2025. ($43,214.48 × 100%) + ($2,640.00 × 0%) + ($92,467.49 × 25%) = $66,331.35. $66,331.35 – $1,423,198.08 = ($1,356,866.73).

# TAB 1

# IRS Revenue Ruling 59-60

**Rev. Rul. 59-60, 1959-1 CB 237 -- IRC Sec. 2031 (Also Section 2512.)** (Also Part II, Sections 811(k), 1005, Regulations 105, Section 81.10.)

***Reference(s):*** Code Sec. 2031 Reg § 20.2031-2

In valuing the stock of closely held corporations, or the stock of corporations where market quotations are not available, all other available financial data, as well as all relevant factors affecting the fair market value must be considered for estate tax and gift tax purposes. No general formula may be given that is applicable to the many different valuation situations arising in the valuation of such stock. However, the general approach, methods, and factors which must be considered in valuing such securities are outlined.

Revenue Ruling 54-77, C.B. 1954-1, 187, superseded.

**Full Text:**

**Section 1. Purpose.**

The purpose of this Revenue Ruling is to outline and review in general the approach, methods and factors to be considered in valuing shares of the capital stock of closely held corporations for estate tax and gift tax purposes. The methods discussed herein will apply likewise to the valuation of corporate stocks on which market quotations are either unavailable or are of such scarcity that they do not reflect the fair market value.

**Sec. 2. Background and Definitions.**

.01 All valuations must be made in accordance with the applicable provisions of the Internal Revenue Code of 1954 and the Federal Estate Tax and Gift Tax Regulations. Sections 2031(a), 2032 and 2512(a) of the 1954 Code (sections 811 and 1005 of the 1939 Code) require that the property to be included in the gross estate, or made the subject of a gift, shall be taxed on the basis of the value of the property at the time of death of the decedent, the alternate date if so elected, or the date of gift.

.02 Section 20.2031-1(b) of the Estate Tax Regulations (section 81.10 of the Estate Tax Regulations 105) and section 25.2512-1 of the Gift Tax Regulations (section 86.19 of Gift Tax Regulations 108) define fair market value, in effect, as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts. Court decisions frequently state in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and concerning the market for such property.

.03 Closely held corporations are those corporations the shares of which are owned by a relatively limited number of stockholders. Often the entire stock issue is held by one family. The result of this situation is that little, if any, trading in the shares takes place. There is, therefore, no established market for the stock and such sales as occur at irregular intervals seldom reflect all of the elements of a representative transaction as defined by the term “fair market value."

**Sec. 3. Approach to Valuation.**

.01 A determination of fair market value, being a question of fact, will depend upon the circumstances in each case. No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases. Often, an appraiser will find wide differences of opinion as to the fair market value of a particular stock. In resolving such differences, he should maintain a

# TAB 2

**Fill in this information to identify the case:**

Debtor Name JASON MOWATT

United States Bankruptcy Court for the: CENTRAL District of CA (State)

Case number: 2:26-bk-10379-NB

Official Form 426

# Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest

**12/17**

This is the *Periodic Report* as of 02/05/26 on the value, operations, and profitability of those entities in which a Debtor holds, or two or more Debtors collectively hold, a substantial or controlling interest (a "Controlled Non-Debtor Entity"), as required by Bankruptcy Rule 2015.3. For purposes of this form, "Debtor" shall include the estate of such Debtor.

Jason Mowatt holds a substantial or controlling interest in the following entities:

| Name of Controlled Non-Debtor Entity | Interest of the Debtor | Tab # |
|---|---|---|
| Trap Karaoke, LLC | 100% | 1 |
| UGX, LLC | 100% | 2 |
| UGX Brands, LLC | 100% | 3 |

This *Periodic Report* contains separate reports (*Entity Reports*) on the value, operations, and profitability of each Controlled Non-Debtor Entity.

Each *Entity Report* consists of five exhibits.

*Exhibit A* contains the most recently available: balance sheet, statement of income (*loss*), statement of cash flows, and a statement of changes in shareholders' or partners' equity (*deficit*) for the period covered by the *Entity Report*, along with summarized footnotes.

*Exhibit B* describes the Controlled Non-Debtor Entity's business operations.

*Exhibit C* describes claims between the Controlled Non-Debtor Entity and any other Controlled Non-Debtor Entity.

*Exhibit D* describes how federal, state or local taxes, and any tax attributes, refunds, or other benefits, have been allocated between or among the Controlled Non-Debtor Entity and any Debtor or any other Controlled Non-Debtor Entity and includes a copy of each tax sharing or tax allocation agreement to which the Controlled Non-Debtor Entity is a party with any other Controlled Non-Debtor Entity.

*Exhibit E* describes any payment, by the Controlled Non-Debtor Entity, of any claims, administrative expenses or professional fees that have been or could be asserted against any Debtor, or the incurrence of any obligation to make such payments, together with the reason for the entity's payment thereof or incurrence of any obligation with respect thereto.

**This *Periodic Report* must be signed by a representative of the trustee or debtor in possession.**

# TRAP KARAOKE, LLC

## EXHIBIT B

Trap Karaoke, LLC, is a promoter that organizes interactive events where participants sing along and dance to hip-hop songs. Formed in 2015, Trap Karaoke organizes approximately 70 events each year in clubs and concert venues across the country. At each event approximately 15-20 attendees are selected to appear on stage and sing a chosen trap, R&B, Old School, or Gospel song. In 2025, Trap Karaoke generated over $5.9 million in revenue from ticket sales and sponsorships.

# TAB 3

## Part 4: Describe Your Financial Assets

**Do you own or have any legal or equitable interest in any of the following?**

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

16. **Cash**

*Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition

☐ No
☑ Yes ........ Cash: ........ $ 10.00

17. **Deposits of money**

*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.

☐ No
☑ Yes ........

| | Institution name: | |
|---|---|---|
| 17.1. Checking account: | Capital One (account ending 5925) | $ 2,159.56 |
| 17.2. Checking account: | | $ |
| 17.3. Savings account: | Capital One (account ending 9000) | $ 3,485.25 |
| 17.4. Savings account: | | $ |
| 17.5. Certificates of deposit: | | $ |
| 17.6. Other financial account: | | $ |
| 17.7. Other financial account: | | $ |
| 17.8. Other financial account: | | $ |
| 17.9. Other financial account: | | $ |

18. **Bonds, mutual funds, or publicly traded stocks**

*Examples:* Bond funds, investment accounts with brokerage firms, money market accounts

☐ No
☑ Yes ........

| Institution or issuer name: | |
|---|---|
| First Trade | $ 1,601.29 |
| Robin Hood | $ 1,715.81 |
| Coinbase | $ 1,440.10 |

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**

☐ No
☑ Yes. Give specific information about them........

| Name of entity: | % of ownership: | |
|---|---|---|
| Trap Karaoke, LLC | 100% % | $ 0.00 |
| UGX, LLC | 100% % | $ 0.00 |
| UGX Brands, LLC | 100% % | $ 0.00 |

EXHIBIT D, page 53

# TAB 4

## Trap Karaoke LLC

## 5 Year Historical Profit & Loss Summary

| *($ in USD)* | **2021** | **2022** | **2023** | **2024** | **2025** |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| Sales (Gross) | $990,754 | $2,809,933 | $5,116,128 | $4,873,530 | $5,935,555 |
| Discounts/Refunds | - | - | ($815) | ($1,292) | - |
| Sponsorship & Other Revenue | - | - | - | $62,200 | - |
| **Total Revenue (Net)** | **$990,754** | **$2,809,933** | **$5,115,313** | **$4,934,438** | **$5,935,555** |
| | | | | | |
| **Direct Production Costs** | | | | | |
| Subcontractors (incl. contractor meals) | $286,816 | $715,903 | $1,473,665 | $1,041,407 | $1,198,819 |
| Venues | $46,402 | $232,333 | $589,605 | $795,291 | $1,263,760 |
| Equipment Rental | $3,617 | $55,300 | $157,951 | $246,719 | $210,656 |
| Merchandise | - | - | $118,776 | $79,129 | $133,179 |
| Production Travel Expense | $83,116 | $89,452 | $113,856 | $559,601 | $698,014 |
| **Total Direct Production Costs** | **$419,951** | **$1,092,988** | **$2,453,853** | **$2,722,147** | **$3,504,427** |
| | | | | | |
| **Gross Profit** | **$570,803** | **$1,716,945** | **$2,661,460** | **$2,212,292** | **$2,431,128** |
| *Gross Margin %* | *57.6%* | *61.1%* | *52.0%* | *44.8%* | *41.0%* |
| | | | | | |
| **Operating Expenses** | | | | | |
| Advertising & Promotion | $211,169 | $802,257 | $1,360,281 | $2,017,935 | $1,863,603 |
| Professional Fees | $6,849 | $205,472 | $499,123 | $266,205 | $436,998 |
| Professional Development & Dues | $6,487 | $29,448 | $8,300 | $2,008 | $3,703 |
| Insurance | $3,307 | $8,313 | $32,682 | $45,629 | $42,555 |
| Office, Computer & Supplies | $32,951 | $19,690 | $41,522 | $59,429 | $72,195 |
| Postage, Telephone, Website & WiFi | $5,983 | $22,522 | $35,339 | $11,960 | $11,481 |
| Bank & Merchant Fees | $150 | $885 | $4,635 | $16,452 | $6,999 |
| Depreciation | - | - | - | $88,062 | $41,194 |
| Pension Plan Expense | - | - | $90,550 | - | - |
| Other Operating Expenses | $4,495 | $1,182 | $21,106 | $3,628 | $32,439 |
| **Total Operating Expenses** | **$271,391** | **$1,089,769** | **$2,093,538** | **$2,511,308** | **$2,511,167** |
| | | | | | |
| **Net Operating Income** | **$299,412** | **$627,176** | **$567,922** | **($299,016)** | **($80,039)** |
| *Net Operating Margin %* | *30.2%* | *22.3%* | *11.1%* | *(6.1%)* | *(1.3%)* |
| | | | | | |
| **Other Income / (Expense)** | | | | | |
| Interest Expense | $3,604 | $3,821 | $3,188 | $2,429 | $81,375 |
| Other Income | - | - | - | $18 | - |
| **Net Other Income/(Expense)** | **($3,604)** | **($3,821)** | **($3,188)** | **($2,411)** | **($81,375)** |
| | | | | | |
| **Net Income** | **$295,808** | **$623,355** | **$564,734** | **($301,427)** | **($161,415)** |
| *Net Margin %* | *29.9%* | *22.2%* | *11.0%* | *(6.1%)* | *(2.7%)* |

# TAB 5

# Trap Karaoke LLC

## 5 Year Balance Sheet Summary

| | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash - Checking | $96,941 | $517,711 | $359,639 | $11,523 | $43,214 |
| Other Current Assets (Investment in Wefunder) | - | - | - | - | $2,640 |
| **Total Current Assets** | **$96,941** | **$517,711** | **$359,639** | **$11,523** | **$45,854** |
| | | | | | |
| Machinery & Equipment (Gross) | $3,906 | $3,906 | $18,666 | $128,548 | $155,110 |
| Accumulated Depreciation | ($3,906) | ($3,906) | ($3,906) | ($91,969) | ($133,163) |
| Assets Not Yet in Service | - | - | - | - | $70,520 |
| **Total Fixed Assets** | **-** | **-** | **$14,759** | **$36,579** | **$92,467** |
| | | | | | |
| **TOTAL ASSETS** | **$96,941** | **$517,711** | **$374,398** | **$48,102** | **$138,322** |
| | | | | | |
| **Liabilities** | | | | | |
| Credit Cards - American Express | $95,633 | $225,253 | $163,335 | $170,536 | $164,565 |
| Credit Cards - Capital One Venture | - | - | - | $5,458 | $2,487 |
| **Total Credit Cards** | **$95,633** | **$225,253** | **$163,335** | **$175,993** | **$167,052** |
| | | | | | |
| Sales Tax Payable | $339,797 | $343,736 | $480,085 | $692,893 | $1,156,146 |
| Note Payable - NewCo Capital Group | - | - | - | - | $80,752 |
| **Total Other Current Liabilities** | **$339,797** | **$343,736** | **$480,085** | **$692,893** | **$1,236,898** |
| **Total Current Liabilities** | **$435,430** | **$568,989** | **$643,420** | **$868,886** | **$1,403,950** |
| | | | | | |
| Joan Mowatt Palmer Loan (Long-Term) | $30,000 | - | - | $100,000 | $100,000 |
| | | | | | |
| **TOTAL LIABILITIES** | **$465,430** | **$568,989** | **$643,420** | **$968,886** | **$1,503,950** |
| | | | | | |
| **Equity** | | | | | |
| Member Contributions | - | $100,000 | - | - | $112,096 |
| Member's Equity (accumulated) | ($172,224) | ($368,489) | ($93,779) | ($269,022) | ($920,783) |
| Member's Draws | ($492,073) | ($406,144) | ($739,977) | ($350,334) | ($467,163) |
| Net Income (current year) | $295,808 | $623,355 | $564,734 | ($301,427) | ($161,415) |
| *Balancing Adjustment* | | | | | *$71,637* |
| **TOTAL EQUITY** | **($368,489)** | **($51,278)** | **($269,022)** | **($920,783)** | **($1,365,628)** |
| | | | | | |
| **TOTAL LIABILITIES AND EQUITY** | **$96,941** | **$517,711** | **$374,398** | **$48,102** | **$138,322** |
| | | | | | |
| | - | - | - | - | - |

# TAB 6

# UGX, LLC

## EXHIBIT A

The entity is not an operating entity and does not ordinarily prepare financial statements

The Debtor is the sole member of the entity, which is the sole member UGX Brands, LLC.

# UGX, LLC

## EXHIBIT B

The entity is a holding company that owns 100% of the membership interests in UGX Brands, LLC.

# UGX BRANDS, LLC

## EXHIBIT B

The entity develops, maintains and holds title to certain intellectual property and licenses certain of that intellectual property to Trap Karaoke, LLC.

# TAB 7

**TRAP KARAOKE, LLC**

**EXHIBIT C**

The entity licenses intellectual property from UGX Brands, LLC. Historically, no intercompany fees were recorded.

**UGX BRANDS, LLC**

**EXHIBIT C**

The entity licenses intellectual property to Trap Karaoke, LLC. Historically, no intercompany fees were recorded.

# TAB 8

*This page left intentionally blank.*

# TAB 9

# UGX Brands LLC

## Balance Sheet

As of December 31, 2024

### Assets

| | |
|---|---|
| Total Assets | $0 |

### Liabilities

| | |
|---|---|
| Total Liabilities | $0 |

### Equity

| | |
|---|---|
| Capital Contributions | $53,925 |
| Retained Earnings | ($53,925) |
| **Total Equity** | **$0** |
| **Total Liabilities & Equity** | **$0** |

**SCHEDULE C (Form 1040)**
Department of the Treasury Internal Revenue Service

# Profit or Loss From Business
(Sole Proprietorship)

Attach to Form 1040, 1040-SR, 1040-SS, 1040-NR, or 1041; partnerships must generally file Form 1065.
Go to www.irs.gov/ScheduleC for instructions and the latest information.

OMB No. 1545-0074
**2024**
Attachment Sequence No. 09

| Name of proprietor | Social security number (SSN) |
|---|---|
| JASON MOWATT | ***-**-9113 |

A Principal business or profession, including product or service (see instructions)

B Enter code from instructions: 713900

C Business name. If no separate business name, leave blank.
UGX BRANDS LLC

D Employer ID number (EIN) (see instr.): 33-3157348

E Business address (including suite or room no.)
City, town or post office, state, and ZIP code

F Accounting method: (1) [X] Cash (2) [ ] Accrual (3) [ ] Other (specify)

G Did you "materially participate" in the operation of this business during 2024? If "No," see instructions for limit on losses — [X] Yes [ ] No

H If you started or acquired this business during 2024, check here [ ]

I Did you make any payments in 2024 that would require you to file Form(s) 1099? See instructions — [ ] Yes [X] No

J If "Yes," did you or will you file required Form(s) 1099? — [ ] Yes [ ] No

## Part I Income

| | Description | Line | Amount |
|---|---|---|---|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked [ ] | 1 | |
| 2 | Returns and allowances | 2 | |
| 3 | Subtract line 2 from line 1 | 3 | |
| 4 | Cost of goods sold (from line 42) | 4 | |
| 5 | **Gross profit.** Subtract line 4 from line 3 | 5 | |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) | 6 | |
| 7 | **Gross income.** Add lines 5 and 6 | 7 | |

## Part II Expenses. Enter expenses for business use of your home **only** on line 30.

| | Expense | Line | Amount | | Expense | Line | Amount |
|---|---|---|---|---|---|---|---|
| 8 | Advertising | 8 | | 18 | Office expense | 18 | |
| 9 | Car and truck expenses (see instructions) | 9 | | 19 | Pension and profit-sharing plans | 19 | |
| 10 | Commissions and fees | 10 | | 20 | Rent or lease (see instructions): | | |
| 11 | Contract labor (see instructions) | 11 | | a | Vehicles, machinery, and equipment | 20a | |
| 12 | Depletion | 12 | | b | Other business property | 20b | 13,350. |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) | 13 | | 21 | Repairs and maintenance | 21 | |
| 14 | Employee benefit programs (other than on line 19) | 14 | | 22 | Supplies (not included in Part III) | 22 | |
| 15 | Insurance (other than health) | 15 | | 23 | Taxes and licenses | 23 | |
| 16 | Interest (see instructions): | | | 24 | Travel and meals: | | |
| a | Mortgage (paid to banks, etc.) | 16a | | a | Travel | 24a | |
| b | Other | 16b | | b | Deductible meals (see instructions) | 24b | |
| 17 | Legal and professional services | 17 | 26,125. | 25 | Utilities | 25 | |
| | | | | 26 | Wages (less employment credits) | 26 | |
| | | | | 27 a | Other expenses (from line 48) | 27a | 14,450. |
| | | | | b | Energy efficient commercial bldgs deduction (attach Form 7205) | 27b | |

| | Description | Line | Amount |
|---|---|---|---|
| 28 | **Total expenses** before expenses for business use of home. Add lines 8 through 27b | 28 | 53,925. |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7 | 29 | -53,925. |

# TAB 10

# JASON MOWATT
## Attachment 4.33
## Claims against third parties

On July 31, 2024, UGX Brands, LLC, and Trap Karaoke, LLC, filed a complaint for trademark infringement and related claims against The City Of Norfolk d/b/a Seven Venues, Global Music Touring, LLC, Antonio Dowe, and Terrence Thornton p/k/a PUSHA T, in the District Court for the Southern District of New York, Case No. 1:24-cv-05839, which litigation is currently pending. The Debtor is not a party to the litigation. On January 16, 2026, the case was transferred to the Eastern District of Virginia.

# TAB 11

*This page left intentionally blank.*

# TAB 12

Jason Mowatt
Cash Flow Projection

| **Trap Karaoke** | | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031** | **Notes** |
|---|---|---|---|---|---|---|---|---|---|
| **Gross Revenue** | | 6,303,555 | 6,625,000 | 6,956,250 | 7,304,063 | 7,669,266 | 8,052,729 | 8,455,365 | Annual growth of 5% |
| Less: Sales Tax | | (368,000) | (386,400) | (405,720) | (426,006) | (447,306) | (469,672) | (493,155) | Annual growth of 5% |
| **Net Revenue** | | 5,935,555 | 6,238,600 | 6,550,530 | 6,878,057 | 7,221,959 | 7,583,057 | 7,962,210 | |
| **Expenses** | | | | | | | | | |
| Subcontractors | | (1,198,819) | (1,250,000) | (1,312,500) | (1,378,125) | (1,447,031) | (1,519,383) | (1,595,352) | Annual increases of 5% |
| Merchandise Purchases | | (133,179) | (135,000) | (141,750) | (148,838) | (156,279) | (164,093) | (172,298) | Annual increases of 5% |
| Rents | | (1,489,205) | (1,600,000) | (1,680,000) | (1,764,000) | (1,852,200) | (1,944,810) | (2,042,051) | Annual increases of 5% |
| Interest | | (81,375) | (40,000) | - | - | - | - | - | |
| Computers & equipment Purchases | | (41,193) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | Keeping flat |
| Advertising | | (1,863,603) | (1,970,000) | (1,930,600) | (1,891,988) | (1,854,148) | (1,817,065) | (1,780,724) | Look to decrease Meta advertising expenses 2% per year starting in 2027 |
| Travel | | (698,014) | (760,000) | (798,000) | (837,900) | (879,795) | (923,785) | (969,974) | Annual increases of 5% |
| Professional fees | | (436,998) | (250,000) | (125,000) | (131,250) | (137,813) | (144,703) | (151,938) | Annual increases of 5%, after elim. Litigation expenses |
| Sales Tax Consultants | | - | - | (50,000) | (15,000) | - | - | - | Fees to complete sales tax settlements |
| Website and Computer Expenses | | (61,710) | (65,000) | (68,250) | (71,663) | (75,246) | (79,008) | (82,958) | Annual increases of 5% |
| Insurance | | (42,555) | (45,000) | (47,250) | (49,613) | (52,093) | (54,698) | (57,433) | Annual increases of 5% |
| Event Research | | (16,412) | (17,000) | (17,850) | (18,743) | (19,680) | (20,664) | (21,697) | Annual increases of 5% |
| Financing, Bank and Merchant Fees | | (20,431) | (7,000) | (7,350) | (7,718) | (8,103) | (8,509) | (8,934) | Annual increases of 5% (remove Stripe loan fee from 2025) |
| Other Misc Expenses | | (12,298) | (12,000) | (12,600) | (13,230) | (13,892) | (14,586) | (15,315) | Annual increases of 5% |
| **Total Expenses** | | (6,095,792) | (6,176,000) | (6,216,150) | (6,353,066) | (6,521,280) | (6,716,303) | (6,923,674) | |
| Taxable Income (Loss) | | (160,237) | 62,600 | 334,380 | 524,991 | 700,680 | 866,754 | 1,038,536 | |
| Less: | | | | | | | | | |
| State Income Taxes | | - | (5,008) | (26,750) | (41,999) | (56,054) | (69,340) | (83,083) | 8% tax rate on taxable income |
| **Net Cash Flow from Trap Karaoke** | | (160,237) | 57,592 | 307,630 | 482,992 | 644,625 | 797,414 | 955,453 | |
| **SDE MARGIN** | | | **0.92%** | **4.70%** | **7.02%** | **8.93%** | **10.52%** | **12.00%** | **7.35%** |
| **Jason Mowatt** | | | | | | | | | |
| Cash flow from Trap Karaoke | | (160,237) | 57,592 | 307,630 | 482,992 | 644,625 | 797,414 | 955,453 | |
| Housing | | (72,960) | (72,960) | (76,608) | (80,438) | (84,460) | (88,683) | (93,118) | Annual increase of 5% |
| Home Maintenance | | (3,000) | (3,000) | (3,150) | (3,308) | (3,473) | (3,647) | (3,829) | Annual increase of 5% |
| Food and housekeeping | | (18,000) | (18,000) | (18,900) | (19,845) | (20,837) | (21,879) | (22,973) | Annual increase of 5% |
| Personal care | | (4,800) | (4,800) | (5,040) | (5,292) | (5,557) | (5,834) | (6,126) | Annual increase of 5% |
| Medical and Dental | | (3,600) | (3,600) | (3,780) | (3,969) | (4,167) | (4,376) | (4,595) | Annual increase of 5% |
| Transportation | | (18,000) | (18,000) | (18,900) | (19,845) | (20,837) | (21,879) | (22,973) | Annual increase of 5% |
| Health Insurance | | (10,800) | (10,800) | (11,340) | (11,907) | (12,502) | (13,127) | (13,784) | Annual increase of 5% |
| Utilities | | (1,572) | (1,572) | (1,651) | (1,733) | (1,820) | (1,911) | (2,006) | Annual increase of 5% |
| **EBITDA** | | (292,969) | (75,140) | 168,261 | 336,655 | 490,971 | 636,077 | 786,050 | |
| **EBITDA MARGIN** | | | **-1.20%** | **2.57%** | **4.89%** | **6.80%** | **8.39%** | **9.87%** | **5.22%** |
| Income Taxes (at 40%) | | - | (18,717) | (118,516) | (188,434) | (252,849) | (313,715) | (376,668) | Actual calculated at 40% |
| Net Cash Flow before sales tax payments | | (585,938) | (168,997) | 218,006 | 484,876 | 729,094 | 958,440 | 1,195,432 | |
| Accrued Sales Tax - Historical | (1,150,000) | | | (218,006) | (484,876) | (729,094) | (958,440) | 1,240,415 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Excess Cash Flow | | | - | - | - | - | 2,435,848 |
| | | | | | | | |
| **Calculation of Income Taxes:** | | | | | | | |
| Taxable Income - Current Year | (171,037) | 46,792 | 296,290 | 471,085 | 632,123 | 784,286 | 941,670 |
| Deduction for Sales Tax Payments Not Deducted as of 12/31/25 | | | - | - | - | - | - |
| Loss Carryover - 2024 | (287,773) | - | - | - | | | |
| Loss Carryover Utilized -2025 | | | | | | | |
| Section 357(c) Gain on S corp conversion | 525,000 | | | | | | |
| Taxable Income | 66,190 | 46,792 | 296,290 | 471,085 | 632,123 | 784,286 | 941,670 |
| | | | | | | | |
| Income Taxes (at 40%) | 20,600 | 18,717 | 118,516 | 188,434 | 252,849 | 313,715 | 376,668 |

Footnote re: NOL - Trap Karaoke converted from a sole proprietorship (Schedule C on Jason's personal 1040) to an S corporation effective 1/1/2025. As a result of the S corporation election, income was triggered due to the liabilities of the business exceeding the tax basis of the assets. As a result, the net operating loss from 2024 is fully utilized on the 2025 tax return.
Actual taxes owed for 2025 are reported above of $20,600.

# TAB 13

*This page left intentionally blank.*

# TAB 14

*This page left intentionally blank.*

# TAB 15

*This page left intentionally blank.*

# TAB 16

*This page left intentionally blank.*

# TAB 17

IBBA INTERNATIONAL BUSINESS BROKERS ASSOCIATION.® | Market Pulse | M&A Source

# Q2 2026 Highlights

## WHERE ADVISORS SEE INTEREST MOVING

NET BUYER-INTEREST SCORE, Q2 2026
ONE-TIME ADVISOR SENTIMENT QUESTION; NOT COMPLETED TRANSACTION ACTIVITY




| ENTERPRISE VALUE OF MARKET SEGMENTS STUDIED | |
|---|---|
| MAIN STREET | LOWER MIDDLE MARKET |
| ‹$500K | $2M-$5M |
| $500K-$1M | $5M-$50M |
| $1M-$2M | |

*"The market is not moving in one direction. Above $2 million, strong businesses are still drawing meaningful competition. At the smallest end of the market, however, buyers have more leverage and are more sensitive to financing, margins, and operating risk."*
*– James Parker, 2026 IBBA Chairman of the Board*

## BUSINESS VALUE

MULTIPLES Q2 2023 - 2026




<$500K - $2M in Purchase Price reflected as multiple of SDE (Seller's Discretionary Earnings);
$2M-$50M as multiple of EBITDA (Earnings Before Interest, Taxes, Depreciation & Amortization).

## SELLER'S MARKET SENTIMENT Q2 2016-2026




## DEAL FINANCING Q2 2026



# TAB 18

IBBA INTERNATIONAL BUSINESS BROKERS ASSOCIATION.®

Market Pulse

M&A Source

# Q2 2026 Highlights

## WHERE ADVISORS SEE INTEREST MOVING

NET BUYER-INTEREST SCORE, Q2 2026
ONE-TIME ADVISOR SENTIMENT QUESTION; NOT COMPLETED TRANSACTION ACTIVITY




| ENTERPRISE VALUE OF MARKET SEGMENTS STUDIED | |
|---|---|
| MAIN STREET | LOWER MIDDLE MARKET |
| ‹$500K | $2M-$5M |
| $500K-$1M | $5M-$50M |
| $1M-$2M | |

*"The market is not moving in one direction. Above $2 million, strong businesses are still drawing meaningful competition. At the smallest end of the market, however, buyers have more leverage and are more sensitive to financing, margins, and operating risk."*
*– James Parker, 2026 IBBA Chairman of the Board*

## BUSINESS VALUE

MULTIPLES Q2 2023 - 2026




<$500K - $2M in Purchase Price reflected as multiple of SDE (Seller's Discretionary Earnings);
$2M-$50M as multiple of EBITDA (Earnings Before Interest, Taxes, Depreciation & Amortization).

## SELLER'S MARKET SENTIMENT Q2 2016-2026




## DEAL FINANCING Q2 2026






Get more data and insights by participating in our next Market Pulse Survey. Learn more at ibba.org.

# TAB 19

*This page left intentionally blank.*

# TAB 20

# Fw: Mowatt plan

**From:** Jason Mowatt <jason@trapkaraoke.com>
**Sent:** Friday, 02 October 2026 12:15:03
**To:** Kevin F. Henry <khenry@freemanmills.com>
**Cc:** David Shemano <dshemano@shemanolaw.com>; Dave Groves <Dave.Groves@claconnect.com>
**Subject:** Re: Mowatt plan

Great talking to you yesterday Kevin. The travel expenses listed in the P&L covers 8 personnel (including myself) that travel with the show.

For purposes of the liquidation analysis, I wanted to provide some additional context regarding my role in Trap Karaoke and the level of founder dependency currently built into the business.

My responsibilities span several functions that would likely need to be replaced by approximately seven separate roles if I were no longer involved (3 of which would require additional travel/onsite):

1. CEO / President
   Overall company strategy, financial decisions, major partnerships, vendor and agency management, and key operating decisions.

2. Executive Producer
   Oversees the overall Trap Karaoke live product, including show format, segment development, creative direction, audience experience, and maintaining the quality and consistency of the show across markets.

3. Show Director
   Directly manages the show's flow and performance, including pacing, transitions, timing, audience energy, performer execution, and real-time decisions necessary to keep the show operating at the expected standard.

4. Performer / On-Stage Talent
   I am also part of the live performance itself. Replacing that function would require additional on-stage talent capable of delivering the established performance style, interacting with the audience, supporting the other performers, and helping drive the show's energy and identity.

5. Booking Director
   Market selection, venue sourcing, routing, venue negotiations, deal structure, and calendar strategy.

6. Head of Growth / Marketing
   Ticket sales strategy, paid media, campaign structure, marketing budgets, funnel strategy, attribution, CRM, email, SMS, and related customer acquisition strategy.

7. Creative Director / Content Lead
   Brand direction, advertising concepts, creative strategy, copy, campaign messaging, social content, and overall creative execution.

# TAB 21

## Tab 21 — U.S. Bureau of Labor Statistics, OEWS, National Estimates (May 2025)




National 10th-percentile and median annual wage, by closest BLS occupational proxy, for each of the seven functional roles described at ¶ 14 of the report and Tab 20. Reproduced from Figure 2 of the report. The 10th-percentile figures (summing to $379,140) are the basis for the key-person replacement-cost adjustment described at ¶ 15.

*Source: U.S. Bureau of Labor Statistics, Occupational Employment and Wage Statistics (OEWS), National estimates, May 2025 (the most recent published release, May 15, 2026). BLS OEWS wage data is published at the national, state, and metropolitan-area level and by industry sector, but is not broken out by establishment size.*

# TAB 22

*This page left intentionally blank.*

# TAB 23

*This page left intentionally blank.*

# TAB 24

*This page left intentionally blank.*

# TAB 25

*This page left intentionally blank.*

# TAB 26

# TIME TO CLOSE

*The average time to sell a small business stayed relatively consistent in Q4 2025, varying from six to 12 months. Of that time roughly three to four months are spent in due diligence, after a signed letter of intent or offer.*

> *"The biggest misconception sellers have is how quickly things move. The more prepared you are on the front end, the smoother, and often shorter, the process feels."*
> *– Lee Sheaffer, President of BizReady, Inc.*

## MONTHS TO CLOSE




## LOI TO CLOSE



# TAB 27

## Trap Karaoke, LLC Balance Sheet as of December 31, 2025 — Liabilities

| Item | Amount |
|---|---:|
| Sales Tax Payable | $1,156,146.10 |
| Credit Cards — American Express | $164,565.16 |
| Credit Cards — Capital One Venture | $2,486.82 |
| Loan — Joan Mowatt Palmer (Long-Term) | $100,000.00 |
| **Total Liabilities (post NewCo payoff)** | **$1,423,198.08** |
| | |
| Note Payable — NewCo Capital Group (FY2025 book balance) | $80,752.00 |
| **Total Liabilities, as reported (FY2025)** | **$1,503,950.08** |

I am informed that the $80,752.00 Note Payable — NewCo Capital Group reflected on the FY2025 Balance Sheet was paid in full by Trap Karaoke, LLC subsequent to December 31, 2025.

# TAB 28

*This page left intentionally blank.*

# TAB 29

*This page left intentionally blank.*

# TAB 30

**Trap Karaoke, LLC Balance Sheet as of December 31, 2025 — Liquidation-Value Assets**

| Item | Amount |
|---|---|
| Asset | FY2025 / Recovery % |
| Cash — Checking | $43,214.48 × 100% |
| Other Current Assets (Investment in Wefunder) | $2,640.00 × 0% |
| Total Fixed Assets (net) | $92,467.49 × 25% |
| **Liquidation-Value Assets** | **$66,331.35** |
| **Total Claims Against the LLC** | **$1,423,198.08** |
| **Indicated Shortfall** | **($1,356,866.73)** |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is

SHEMANOLAW
1801 Century Park East, Suite 2500
Los Angeles, CA 90067

A true and correct copy of the foregoing document **FIRST AMENDED PLAN OF REORGANIZATION OF JASON MOWATT DATED OCTOBER 16, 2026** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On October 16, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email address stated below:

- Robert P Goe rgoe@goeforlaw.com, kmurphy@goeforlaw.com;goeforecf@gmail.com;Goe.RobertP.R@notify.bestcase.com;ajohnston@goeforlaw.com
- Nicholas A Koffroth nkoffroth@foxrothschild.com, khoang@foxrothschild.com;ca.dkt@foxrothschild.com
- Ron Maroko ron.maroko@usdoj.gov
- William McCormick Bill.McCormick@ag.tn.gov
- Mark M Sharf (TR) mark@sharflaw.com, C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
- David B Shemano dshemano@shemanolaw.com
- United States Trustee (LA) ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On _______________, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

3. **SERVED BY EMAIL**
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on September 4, 2025, I served the following persons and/or entities by email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 16, 2026 | David B. Shemano | /s David B. Shemano |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |